## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Juanita Jackson, | ) | C/A No.: 1:17-2721-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of Honorable Timothy M. Cain, United States District Judge, dated October 10, 2017, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 4].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial

evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms.

I.      Relevant Background

    A.      Procedural History

On December 13, 2013, Plaintiff filed an application for DIB in which she alleged her disability began on March 1, 2013. Tr. at 168–69. Her application was denied initially and upon reconsideration. Tr. at 62–70 and 74–85. On October 11, 2016, Plaintiff had a video hearing before Administrative Law Judge ("ALJ") Carl B. Watson. Tr. at 35–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 2, 2017, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–34. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 9, 2017. [ECF No. 1].

    B.      Plaintiff's Background and Medical History

        1.      Background

Plaintiff was 64 years old at the time of the hearing. Tr. at 38. She completed high school and obtained a licensed practical nursing ("LPN")

degree. *Id.* at 42. Her past relevant work ("PRW") was as an insurance clerk and a LPN. Tr. at 40. She alleges she has been unable to work since June 2013. Tr. at 39.

2.      Medical History

On March 1, 2013, Emergency Medical Services ("EMS") took Plaintiff to the emergency department at Carolinas Hospital System for treatment of a scalp laceration. Tr. at 303–11. Plaintiff reported she was injured at work when an angry patient pushed her into a door frame. Tr. at 303. The treating physician, Dr. Scott Burns ("Dr. Burns"), noted the laceration was two centimeters long, linear, extended through the dermis into the subcutaneous tissue, and had sharp, clean margins and minimal bleeding. *Id.* He noted there was no tendon or vascular involvement. *Id.* Dr. Burns closed the wound with three staples and sutures. *Id.* He prescribed Vicodin and ibuprofen for pain. Tr. at 304.

On March 1, 2013, Plaintiff also saw Dr. Maria Perez-Garcia ("Dr. Perez-Garcia") at Carolinas Urgent Care and Occupational Health Center. Tr. at 334–36. Dr. Perez-Garcia noted a head contusion with laceration on the left parietal area. Tr. at 334. Plaintiff reported losing consciousness for a few seconds after the injury and complained of neck pain and headache. *Id.* Plaintiff stated the pain from her headache was a 6 out of 10 and did not

radiate to her upper extremity. *Id.* She denied tingling, numbness, or weakness in her upper and lower extremities. *Id.* On examination, Dr. Perez-Garcia noted Plaintiff had tenderness to palpation ("TTP") on the left side of her neck and pain with range of motion ("ROM") on the left side and posterior neck. *Id.* Dr. Perez-Garcia indicated Plaintiff's upper extremity, pupils, nose, ears, throat, lungs, heart, abdomen, and neurologic exam were all normal. *Id.*

Plaintiff received a plain x-ray of her cervical spine. Tr. at 335. The reviewing radiologist, Dr. Steven Creedman ("Dr. Creedman"), noted moderate C5–6 interspace narrowing with small dorsal and bilateral uncovertebral spurs and assessed C5–6 degenerative disc disease ("DDD"). *Id.* Dr. Perez-Garcia stated Plaintiff's x-ray was normal. Tr. at 334. She assessed status post-fall with head contusion and laceration on the scalp (that was repaired with three staples and neck pain). *Id.* She also noted loss of consciousness was questionable. *Id.* Dr. Perez-Garcia opined Plaintiff could return to work the following day, but should be restricted to desk work and should not handle patients without assistance. *Id.* She referred her for a brain computerized tomography ("CT") scan. *Id.*

On March 6, 2013, Plaintiff received a head CT. Tr. at 396. Dr. Charles Parke found mild frontal periventricular white matter low attenuation and a small area of low attenuation in the right anterior limb internal capsule. *Id.*

He noted these findings were most suspicious for mild small vessel ischemic disease and that demyelination seemed less likely. *Id.* He did not find evidence of posttraumatic contusion, mass, or hemorrhage intracranially. *Id.* He noted the left parietal scalp laceration with small staples were in place and indicated he did not see any underlying hematoma or calvarial fracture. *Id.*

On March 8, 2013, Plaintiff had a follow-up appointment with Dr. Perez-Garcia. Tr. at 332–33. Plaintiff complained of headache in the area of the laceration and pain in her right shoulder, posterior neck, and lumbar area. Tr. at 332. She denied tingling, numbness, or weakness in her extremities and denied vision problems. *Id.* Dr. Perez-Garcia indicated Plaintiff's head CT scan was normal. *Id.* On examination, Dr. Perez-Garcia noted Plaintiff had mild TTP of the posterior neck and TTP on the top of the shoulder and the trapezial muscle, but full ROM and very minimal pain with ROM. *Id.* She assessed status post-fall, head contusion, laceration of the scalp, neck pain, lumbar pain, and local reaction to a tetanus shot. *Id.* She continued to restrict Plaintiff to desk work and no patient handling without assistance. *Id.*

On March 11, 2013, Dr. Perez-Garcia continued Plaintiff's work restrictions and prescribed prednisone. Tr. at 331. She noted Plaintiff's

diagnoses included status post-fall, head contusion and laceration, neck pain, lumbar sprain, headache, and local reaction to tetanus shot. *Id.*

On March 18, 2013, Plaintiff returned to Dr. Perez-Garcia. Tr. at 329–30. Plaintiff reported worsening lumbar pain radiating to the posterior right leg with tingling sensation. Tr. at 329. She denied weakness. *Id.* She said the prednisone helped, but the pain returned. *Id.* She also continued to complain of neck pain rated 4 out of 10. *Id.* On examination, Dr. Perez-Garcia noted Plaintiff had no TTP or pressure to her neck and she had full ROM and no pain with ROM. *Id.* Plaintiff had no TTP to her lumbar area, but did have pain with ROM. *Id.* Her reflexes, sensitivity, and muscle strength were normal. *Id.* Dr. Perez-Garcia referred Plaintiff for an MRI of her lumbar spine and continued to restrict her to desk work only. *Id.* She assessed status post-fall with head contusion, neck sprain, lumbar sprain, and paresthesias of the right leg. *Id.* She prescribed Motrin and Flexeril. *Id.*

On March 21, 2013, Plaintiff began seeing Dr. Jimena C. Burnett ("Dr. Burnett") at McLeod Physician Associates. *See* Tr. at 416–18. Plaintiff reported her history of hypertension and low back pain. Tr. at 416. She indicated she had been taking her hypertension medication as directed and had been responding to them well. *Id.* She complained of pain in her lower back on the right side and numbness in her right leg. *Id.* Plaintiff's

medications included Synthroid, Aspir-81, Enalapril Maleate, and Ibuprofen. *Id.* Plaintiff's blood pressure was 164/84. Tr. at 417. Dr. Burnett assessed essential hypertension, colon cancer screening, hypothyroid, annual physical exam, lipid screening, neck pain, and back pain. Tr. at 418. She increased Plaintiff's Enalapril Maleate Tablet dosage and ordered a comprehensive metabolic panel. *Id.*

On March 25, 2013, in another follow-up appointment with Dr. Perez-Garcia, Plaintiff reported her headache had improved and was intermittent, but she continued to experience tinnitus in both ears. Tr. at 327. Plaintiff also reported continued posterior non-radiating neck pain rated 4 out of 10. *Id.* She rated her lumbar pain 3 out of 10 and indicated it continued to radiate to the lateral right thigh. *Id.* Dr. Perez-Garcia noted having ordered an MRI, but it was still pending. *Id.* She noted Plaintiff appeared uncomfortable, but not in acute distress. *Id.* On examination of Plaintiff's neck, Plaintiff experienced TTP posteriorly and at the base of her neck, but only on the soft tissue. *Id.* Plaintiff had full ROM and no pain with ROM. *Id.* Plaintiff had no TTP on her lumbar spine, but had pain with flexion, extension, and lateral movement radiating to her right leg. *Id.* Dr. Perez-Garcia's assessment did not change. *Id.* She continued to restrict Plaintiff to desk work and prescribed diclofenac. *Id.*

On March 27, 2013, Plaintiff received an MRI of her lumbar spine. Tr. at 397. Dr. Charles Parke ("Dr. Parke") noted very mild convex curvature in the upper lumbar spine apex at the L1 level; moderate marked disc degeneration and moderate disc narrowing at T11–12 with circumferential disc bulging, greatest anteriorly; posterior disc bulging causing mild thecal sac effacement and mild right foraminal stenosis, but no focal cord compression; minor left sided annular bulging extending to the foramen and mild facet arthrosis at L4–5; mild disc degeneration peripherally, left anterior and left lateral annular bulging with mild left foraminal narrowing due to disc bulge at L2–3 and L3–4; and a small annular fissure on the left side at L2–3. *Id.* His impression included no evident fractures or lumbar compressive discopathy; moderate to advanced T11–12 disc degeneration with chronic circumferential annular bulging, but no defined cord compression and mild right foraminal narrowing due to asymmetric disc bulging and spondylosis; and left-sided mild disc degeneration and annular bulging at L2–3 and L3–4. *Id.*

On April 1, 2013, Plaintiff returned to Dr. Perez-Garcia. Tr. at 324. Plaintiff rated her neck pain 4 out of 10, but only to touch, and Dr. Perez-Garcia noted Plaintiff had full ROM in her neck and no pain with ROM. *Id.* Plaintiff continued to report a posttraumatic headache. *Id.* She indicated her

lumbar pain as 4 out of 10 and radiating to the right leg with numbness. *Id.*
Dr. Perez-Garcia stated a lumbar spine MRI revealed DDD, but no herniated
disc or other acute injury. *Id.* She noted Plaintiff had lumbar pain with ROM
on flexion, extension, and lateral movement. *Id.* Her assessment did not
change. *Id.* She continued to restrict Plaintiff to desk work and referred her
to four weeks of physical therapy. *Id.*

On April 8, 2013, Dr. Perez-Garcia noted Plaintiff was improving. Tr. at
321. Plaintiff reported her neck pain had improved with Flexeril and
Voltaren. *Id.* She described her head pain as a frontal headache that started
on the right side and went to the left side and denied neurological symptoms.
*Id.* Dr. Perez-Garcia noted Plaintiff's uncontrolled blood pressure may be
contributing to her headaches. *Id.* Plaintiff indicated her right leg pain was
worse when sitting and reported stiffness after long periods of immobility. *Id.*
She also complained of constant numbness in her first two toes and low back
pain that worsened with movement. *Id.* An examination of Plaintiff's neck
showed point tenderness over C7 and no ROM restrictions. *Id.* A lumbar
examination revealed pain with movement around L1–L2. *Id.* Dr. Perez-
Garcia continued to restrict Plaintiff to desk work, recommended she not take
Voltaren on a daily basis, and recommended she follow up with her primary

care physician about her blood pressure, as it may be contributing to her headache. *Id.*

On April 9, 2013, Plaintiff attended her first physical therapy session at Progressive Physical Therapy. Tr. at 339. On her medical history form, Plaintiff indicated her pain was aching and constant. Tr. at 353. She stated leaning, sitting, and laying down made her pain feel worse. *Id.* She rated her pain as 8 out of 10, noted her worst pain over the past 30 days had been 10 out of 10, and indicated the least pain she had experienced over the prior 30 days was 4 out of 10. *Id.* The therapist noted Plaintiff had symptoms consistent with a differential diagnosis of low back strain and cervicogenic headaches and recommended she continue physical therapy two to three times a week for four weeks. Tr. at 339.

On April 11, 2013, Plaintiff returned to physical therapy. Tr. at 340. Plaintiff reported a little extended relief after her last session. *Id.*

On April 15, 2013, Plaintiff followed up with Dr. Perez-Garcia. Tr. at 319. She reported continued sharp, intermittent headache pain in the left temporal area and shooting to the right frontal area. *Id.* She rated her headache pain 4 out of 10. *Id.* Plaintiff continued to complain of pain across her lumbar area, with numbness and pain in her right leg and right toe. *Id.* She rated this pain 4 out of 10. *Id.* She reported continued neck pain with

flexion and rated that pain 3 out of 10. *Id.* She complained that flexing her neck caused headaches. *Id.* Dr. Perez-Garcia noted Plaintiff's blood pressure was still elevated, but her family doctor was working on changing her medication. *Id.* Plaintiff reported her two physical therapy sessions had helped a little, especially with her right leg pain. *Id.* On examination, Dr. Perez-Garcia found Plaintiff had mild tenderness on the posterior right side of her neck, full ROM, and some pain with flexion. *Id.* Plaintiff had mild tenderness on the mid and upper lumbar area and across the lumbar spine; normal muscle sprain, reflexes, and sensitivity; and pain with ROM. *Id.* Dr. Perez-Garcia continued to restrict Plaintiff to desk work only. Tr. at 320. She assessed status post-fall with head and brain contusion, neck sprain, lumbar sprain, and posttraumatic headache. Tr. at 319.

On April 16, 2013, Plaintiff told her physical therapist she had done her exercises at home, but not every day, and indicated the Voltaren seemed to numb the pain. Tr. at 341.

On April 18, 2013, Plaintiff returned to physical therapy and reported experiencing a lot of pressure in her neck. Tr. at 342. She indicated a decrease in her headache pain at the end of her session. *Id.*

On April 22, 2013, Plaintiff told Dr. Perez-Garcia she was feeling about the same. Tr. at 316. She stated physical therapy had been helping. *Id.* She

reported intermittent pain behind her eyes, alternating from the left to the right eye. *Id.* Plaintiff's current medications included Enalapril, which Dr. Perez-Garcia noted was not effectively controlling Plaintiff's blood pressure, Synthroid, aspirin, Motrin, and Flexeril. *Id.* On examination, Dr. Perez-Garcia indicated Plaintiff seemed pleasant and comfortable; had TTP on the left and posterior neck; had full ROM in her neck, but complained of pain with ROM; and complained of severe pain to palpation of her lumbar area and numbness of the right leg. *Id.* Plaintiff had normal ambulation and normal reflexes and sensitivity of the lower extremity. *Id.* Dr. Perez-Garcia continued to restrict Plaintiff to desk work only. *Id.* She assessed posttraumatic headache, neck sprain, and lumbar sprain. *Id.* She recommended discontinuing non-steroid anti-inflammatory drugs due to Plaintiff's hypertension. She prescribed Lortab and instructed Plaintiff to continue taking Tylenol and Flexeril and referred her to a neurologist for her headaches. *Id.*

On April 23, 2013, Plaintiff reported her pain returned about two hours after her last physical therapy session. Tr. at 343.

On April 26, 2013, in physical therapy, Plaintiff stated she experienced increased pain with increased pressure on her right lower extremity. Tr. at 344. She again reported decreased headache pain after therapy. *Id.*

On April 29, 2013, Plaintiff returned to Dr. Perez-Garcia. Tr. at 314. Plaintiff continued to report head pain, describing it as piercing and intermittent and rating it a 6 out of 10. *Id.* She also reported a headache across the left side of her head, rated 4 out of 10. *Id.* She denied vision and hearing problems. *Id.* Dr. Perez-Garcia noted having referred Plaintiff to a neurologist for her posttraumatic headache. *Id.* Plaintiff complained of severe posterior pain in her neck, not radiating to her upper extremities. *Id.* She reported improved pain in her lumbar area and indicated the pain was intermittent with movement and rated 4 out of 10. *Id.* She continued to complain of pressure and numbness in her right leg that had not improved. *Id.* Dr. Perez-Garcia noted Plaintiff had limited ROM in her lumbar spine. *Id.* She assessed posttraumatic headache and neck and lumbar sprain and noted Plaintiff's high blood pressure remained uncontrolled. *Id.* She continued to restrict Plaintiff to desk work only. *Id.*

On April 30, 2013, Plaintiff told the physical therapist she had been really sore. Tr. at 345. She reported her headache decreased initially after her last session, but then returned about one hour later and lasted longer. *Id.*

On May 3, 2013, Plaintiff's physical therapist noted she experienced increased headache pain throughout all of her cervical spine activities, especially stretches. Tr. at 346.

On May 5, 2013, Plaintiff told her physical therapist she was not doing well and felt like she had been hit. Tr. at 347. She reported decreased pain following her session. *Id.*

On May 9, 2013, Plaintiff reported her back was feeling better, but her neck had been really bothering her, and her leg still felt heavy. Tr. at 348. She reported decreased headache and neck pain following her physical therapy session. *Id.*

On May 13, 2013, Dr. Perez-Garcia continued Plaintiff's work restriction. Tr. at 313. She noted Plaintiff's diagnoses included neck and lumbar sprain and posttraumatic headache and indicated Plaintiff was to see the neurologist that day. Id.

On May 14, 2013, a physical therapy assistant indicated Plaintiff's compliance with her home exercise plan was fair; her pain was aggravated when she turned her head or walked more than ten feet; and Plaintiff could complete 20 squats and could push and pull a sled with 45 pounds for three minutes with some increased discomfort and headache pain. Tr. at 379. Her report included an Oswestry low back pain questionnaire that Plaintiff apparently completed. Tr. at 380. On the questionnaire, Plaintiff indicated pain medication provided her with little relief from pain; she could take care of herself normally without causing increased pain; she could lift only very

light weights; pain prevented her from walking more than a quarter mile, sitting for more than 10 minutes, and standing for more than 30 minutes; she could sleep well only by using pain medication; pain prevented her from going out very often, restricted her travel to short, necessary journeys under 30 minutes, and prevented her from doing anything but light duties. *Id.*

The records from Progressive Physical Therapy also include an undated Oswestry neck questionnaire, on which Plaintiff indicated her pain was mild at the moment; she could look after herself normally without causing extra pain; she could lift only very light weights; she could not read as much as she wanted because of moderate pain in her neck; she had headaches almost all the time; she had a lot of difficulty concentrating when she wanted to; she could not do her usual work; she could not drive her car as long as she wanted because of moderate pain in her neck; her sleep was moderately disturbed; and she could hardly do any recreational activities because of pain in her neck. Tr. at 377.

On May 17, 2013, Plaintiff returned to physical therapy. Tr. at 350. She reported neck pain following her last session and expressed concern there might be a more serious problem. *Id.* She complained of increased pulling and tenderness in her cervical spine. *Id.*

On May 20, 2013, Dr. Perez-Garcia indicated Plaintiff's work restriction would continue until her neurologist indicated otherwise. Tr. at 312. She discharged Plaintiff with diagnoses of neck sprain, lumbar sprain, right leg numbness, and posttraumatic headache. *Id.*

On June 3, 2013, Dr. George Sandoz ("Dr. Sandoz") of Grand Strand Spine and Neuro examined Plaintiff for complaints of headache, neck pain, back pain, and loss of consciousness. Tr. at 558–60. Plaintiff indicated her headaches were moderate to severe; had been occurring daily for three months; we located in the frontal left, frontal right, and occipital, with radiation to posterior. Tr. at 558. She reported debilitating pressure, mostly during the daytime, aggravated by head position, noise, and stress. *Id.* She reported associated blurred vision, memory loss, neurological symptoms, performance changes, stiff neck, and visual aura, but denied dizziness. *Id.* Plaintiff described her neck pain as daily moderate aching and burning and located in the bilateral posterior neck with radiation to the bilateral head and upper arm. *Id.* She indicated the pain was aggravated by flexion, hyperextension, kneeling, walking, and working, and that she experienced relief from massage. *Id.* She noted associated symptoms of trouble sleeping, muscle spasm, and tenderness, and denied bladder retention. *Id.* Plaintiff described her back pain as moderate to severe, persistent, worsening, located

in the lower back, and radiating to the dermatome anteriorly. *Id.* She noted her symptoms were aggravated by daily activities and denied any relieving factors. *Id.* Plaintiff reporting losing consciousness when she fell in March and indicated associated symptoms of headache, memory loss, and neurological symptoms and denied bladder incontinence. *Id.*

On examination, Dr. Sandoz noted Plaintiff experienced muscle spasms in both her cervical and lumbar spine. Tr. at 559. He assessed headache, neck pain, back pain, and syncope. *Id.* He ordered a brain MRI to evaluate the possibility of a stroke and recommended Plaintiff continue with light duty work and tramadol for her pain. Tr. at 559–60.

On June 4, 2013, Plaintiff canceled her physical therapy appointment, stating she wanted to have additional tests done by a doctor before continuing physical therapy. Tr. at 351.

On June 19, 2013, Plaintiff's physical therapist discharged her from physical therapy because she had been referred to a specialist and was undergoing testing. Tr. at 369.

On July 1, 2013, Dr. Stephen Gordin ("Dr. Gordin") administered an MRI of Plaintiff's cervical spine. Tr. at 398. Dr. Gordin noted some degenerative spurring off the anterior aspect of the C4 vertebral body; a small central disc protrusion mildly attenuating the ventral subarachnoid

space, but not touching the spinal cord, and bilateral facet joint arthropathic changes at C4–5; bilateral facet joint arthropathy, small disc bulge, and bilateral arthropathic facet changes at C5–6; and small disc bulge and bilateral facet joint arthropathy at C6–7. *Id.* His impression included multilevel spondylitic changes, but no focal disc herniation or severe central canal stenosis; only fat noted beneath Plaintiff's marker, but a well-defined lipoma not identified; and some heterogeneity to the left thyroid lobe. *Id.*

On July 9, 2013, Dr. Gordin administered an MRI of Plaintiff's brain. Tr. at 399. Dr. Gordin noted an area of low signal in the periventricular white matter on the right adjacent to the anterior angle of the right lateral ventricle that was of low signal on T1 sequence and bright on T2. *Id.* He stated this suggested a small area of prior ischemia and noted this seemed to correspond with Plaintiff's March 6, 2013 CT scan. *Id.* Dr. Gordin noted some foci on T2 hyperintensity in the left corona radiate and in the right centrum semiovale that suggested gliosis from small vessel ischemia. *Id.* The scan was otherwise unremarkable. *Id.* His impression included evidence of chronic ischemic changes affecting the brain. *Id.* He did not find evidence of pathologic enhancement. *Id.* He indicated white matter disease, which he opined was most likely reflective of small vessel ischemia and was unlikely to

reflect demyelination because there were no associated pathologic enhancements or mass effect to suggest any were acute. *Id.*

On July 22, 2013, Plaintiff had a follow-up appointment with Dr. Sandoz. Tr. at 555–57. Plaintiff indicated her neck pain had worsened and was aggravated by driving, straining, Valsalva, and working. Tr. at 555. She reported relief from narcotic analgesics. *Id.* She reported the pain in her lower back had radiated to the right foot and indicated pain medications relieved her symptoms. *Id.* Plaintiff reported associated symptoms of clumsiness, confusion, memory difficulty, vomiting, and syncope. *Id.* On examination, Dr. Sandoz indicated Plaintiff had muscle spasms in her cervical and lumbar spine, mildly reduced ROM in her cervical spine, and moderate pain with motion in her lumbar spine. Tr. at 556. He noted Plaintiff had been compliant with her medication and was responding to current treatment. *Id.* Dr. Sandoz assessed post-trauma headache, late effect of intracranial injury without mention, cervical spondylosis without myelopathy, and lower back pain. *Id.* He noted changes on her brain and neck MRI; recommended neuropsychological testing, an EEG, a nerve conduction study, and a lumbar spine MRI; and limited Plaintiff to light duty with a 10 pound weight restriction. *Id.*

On August 15, 2013, Plaintiff returned to Dr. Sandoz. Tr. at 552–54. Dr. Sandoz continued to rate Plaintiff's headache and back pain as moderate to severe. Tr. at 552. Plaintiff reported experiencing headaches daily upon awakening. *Id.* Dr. Sandoz noted muscle spasm in Plaintiff's cervical and lumbar spine. Tr. at 553. He assessed posttrauma headache, cervical disc displacement without myelopathy, late effect of intracranial injury without mention, and back pain. *Id.* He recommended Plaintiff continue taking Ultram and noted results of an epidural steroid injection. *Id.* He continued to limit Plaintiff to light duty. *Id.*

On September 26, 2013, Dr. David Scott ("Dr. Scott") at Moore Orthopedics began treating Plaintiff. Tr. at 540–41. Plaintiff reported back, neck, and leg pain since her March 2013 injury. Tr. at 540. She also complained of constant tinnitus and headaches. *Id.* Dr. Scott did not note any abnormalities on physical examination. *Id.* He reviewed Plaintiff's cervical spine MRI and noted some areas of modest neuroforaminal stenosis, but nothing that approached a severe level or that he would expect to manifest in substantial symptoms. Tr. at 541. He took plain films of the cervical and lumbar spine during the visit. *Id.* The cervical spine films showed some DDD and anterior spurring with relative reversal of the normal cervical lordosis. *Id.* The lumbar spine films showed some modest DDD and a little facet

arthrosis, but no impressive listhesis, fracture, DDD, or other impressive pathology. *Id.* Dr. Scott recommended Plaintiff see an ENT for her headaches and tinnitus. *Id.* He indicated he did not see anything overwhelming in her cervical spine, but noted epidural injections may be indicated if her symptoms did not resolve. *Id.*

On October 3, 2013, Plaintiff returned to Dr. Scott with her lumbar spine MRI. Tr. at 539. Dr. Scott examined Plaintiff and noted good cervical ROM and a little bit of pain in the soft tissues around the neck in the paraspinal muscles. *Id.* Dr. Scott reviewed the cervical and lumbar MRIs and did not see anything overly impressive concerning central canal or neural foraminal stenosis. *Id.* He stated he did not see any reason why Plaintiff could not return to work, but noted Plaintiff was adamant that she could not work. *Id.* Plaintiff's insistence that she could not work made Dr. Scott uncomfortable returning her to a place where she was charged with caring for people, so he indicated he would keep her out of work or at least impose lifting, pulling, and pushing restrictions to keep her from having responsibility for lifting or pushing patients. *Id.*

From October 11, 2013, to November 22, 2013, Plaintiff was treated by Dr. Leah Hamoy ("Dr. Hamoy") at Dynamic Physical Therapy of Florence. Tr. at 338, 446, 451–54, 457, 459, 464, 466, 468, 470, 472, 477, 479, 480, 482,

483–85, 486–88.   Dr. Hamoy noted Plaintiff had made progress and reported decreased pain following treatments, but her subjective complaints continued to fluctuate, even without strenuous activities. *Id.*

On October 24, 2013, Plaintiff returned to Dr. Scott for an evaluation of her right hip. Tr. at 537–38. Plaintiff noted her back still hurt and her neck was causing her some discomfort, but she wanted Dr. Scott to pay closer attention to her hip. Tr. at 537. Dr. Scott's physical examination was unremarkable. *Id.* He obtained plain films of the right hip and found no signs of fracture, dislocation, or other bony abnormality; no evidence of femoral head, neck, or shaft fracture; and no impressive overwhelming signs of arthritis. *Id.* Dr. Scott noted Plaintiff seemed generally dissatisfied with her progress and said he would seek another opinion regarding possible interventional procedures. Tr. at 537–38.

On October 29, 2013, Plaintiff returned to Dr. Sandoz. Tr. at 549–51. She rated her headaches as moderate to severe and her neck pain as moderate and indicated that both problems had worsened. Tr. at 549. Plaintiff continued to complain of back pain and memory loss and reported moderate, persistent dizziness. *Id.* Plaintiff described the dizziness as an unstable horizon, occurring spontaneously, aggravated by turning, and relieved by changing position. *Id.* She reported experiencing associated

symptoms of headache and paresthesias, but denied diplopia. *Id.* On examination, Dr. Sandoz indicated muscle spasm in Plaintiff's cervical spine, but found no lumbar spine tenderness and normal mobility and curvature. Tr. at 550. He assessed posttrauma headache, dizziness, lumbar disc displacement, cervical disc displacement without myelopathy, and late effect of intracranial injury without mention. *Id.* He noted Plaintiff's headache was not responding to medication and prescribed Elavil and Imitrex. *Id.* He indicated Plaintiff had seen an ENT, but they were awaiting a neuropsychological evaluation to determine if further treatment was warranted for memory loss. *Id.*

On November 25, 2013, Dr. Amit Sanghi ("Dr. Sanghi") at South Carolina Diagnostic Imaging administered a brain MRI. Tr. at 435–36. He noted Plaintiff continued to experience headaches on the right side of her head, hearing loss in her right ear, blurred vision, and changes in her speech. Tr. at 435. The MRI showed mild diffuse cerebral atrophy, which Dr. Sanghi noted may be age-related, and multiple punctate FLAIR[1] signal abnormalities within the deep white matter of the brain in the basal ganglia and distribution on T2 FLAIR sequences. *Id.* He found no evidence of mass at

[1] Fluid-attenuated inversion recovery ("FLAIR") imaging is a technique that forms image contrast based on T1 and T2 relaxation times.

the costophrenic ("CP") angle, specifically the seventh and eighth cranial nerves. *Id.*

On November 27, 2013, Plaintiff saw Dr. John Clavet ("Dr. Clavet") at Moore Orthopedics for a second opinion regarding her neck and lower back pain. Tr. at 533–36. Plaintiff described her neck pain as located on the left side of the neck at the base of the neck, left upper trap area, 5/10 in severity, aching and throbbing in characteristic. Tr. at 533. She indicated she did not have pain radiating down the arms and the pain was aggravated with flexion, particularly with looking down to read. *Id.* She reported topical heat, massage, and a TENS unit provided relief and that physical therapy had been helpful. *Id.* Plaintiff described her lower back pain as right-sided lumbosacral back pain with a radiating component down the back of the leg to the foot, sharp pain, 4/10 in severity, aggravated with lying in bed, and alleviated with massage and a TENS unit. *Id.* She reported she returned to work on light duty from April 1st through June 8th, but was subsequently told no further light duties were available. *Id.*

Dr. Clavet reviewed Plaintiff's radiographs. Tr. at 533–34. He noted Plaintiff's October 21, 2013 hip films showed enthesopathic changes at bilateral ASIS; minimal inferior changes with preservation of joint spaces at the SI joints; unremarkable bilateral hips with intact femoral acetabular

joint spacing; and unremarkable frog-leg view of the right hip. *Id.* Her lumbar spine films from September 2013 did not show any traumatic changes or evidence of spondylolisthesis or spondylolysis, and intervertebral disc heights were well maintained. Tr. at 534. Her lumbar spine MRI from March 2013 showed intact intervertebral disc heights and minimal degenerative disc changes; patent canal at all levels; mild to moderate left neuroforaminal narrowing; and no indication of any high-grade stenosis at any level. *Id.* Plaintiff's September 2013 plain films of the cervical spine showed straightening of the cervical spine with loss of normal cervical lordosis, mild to moderate spondylitic changes centered at C5–6, and narrowing at the right C5–6 foramen due to bony osteophytic changes. *Id.* Her July 2013 cervical MRI showed mild to moderate degenerative changes centered at C5–6 and mild to moderate right neuroforaminal narrowing. *Id.*

On physical examination of Plaintiff's cervical spine, Dr. Clavet indicated Plaintiff experienced moderate tenderness at the base of the neck extending to the left upper trapezius and achieved chin-to-chest with good extension and full lateral rotation without significant discomfort. Tr. at 534. Regarding Plaintiff's lumbar spine, Dr. Clavet noted palpation of the thoracolumbar and lumbosacral spine was unremarkable; Plaintiff experienced a little bit of discomfort with flexion and extension; flexion to 60

degrees and extension to 10 degrees beyond neutral. *Id.* In addition, Dr. Clavet noted Plaintiff's right hip ranged well without pain and FABER (flexion, abduction, and external rotation) testing was negative on the right. *Id.*

Dr. Clavet assessed cervical sprain/strain and lumbar sprain/strain. Tr. at 535. He reported no acute traumatic changes he would attribute to her March 2013 injury. *Id.* Dr. Clavet agreed with Dr. Scott's treatment plan and did not recommend any more aggressive neuraxial procedures. *Id.*

On December 17, 2013, Plaintiff was seen by Dr. Hopla. Tr. at 492. Dr. Hopla noted Plaintiff's head MRI was normal and Plaintiff should probably see a neurologist about her headaches. *Id.*

On January 21, 2014, Plaintiff followed up with Dr. Scott. Tr. at 531–32. Plaintiff reported her neck and back were feeling a little bit better, but had persistent radiating pain in her right leg and hip. Tr. at 531. Dr. Scott performed a physical examination and found negative straight leg raise bilaterally, good functional knee flexion-extension and hip flexion bilaterally, mild to modest discomfort with internal and external rotation of the right hip, and intact sensation to light touch and pressure in her upper and lower extremities. *Id.* After examining Plaintiff on multiple occasions, Dr. Scott could not identify any impressive substantial pathology and said he did not

have anything else to offer her for her neck and back. *Id.* Dr. Scott noted he offered Plaintiff a therapeutic intra-articular hip injection, which she declined, and offered a referral to a surgical hip specialist for another opinion. *Id.* Dr. Scott stated he felt Plaintiff's neck and back should not keep her from working and that she could work without restrictions. Tr. at 531–32.

On January 24, 2014, Plaintiff followed up with Dr. Sandoz about her head injury. Tr. at 546–48. Plaintiff described her symptoms as incapacitating. Tr. at 546. She indicated the pain was aggravated by sitting up and sound and associated symptoms included clumsiness, gait disturbance, headache, irritability, and visual disturbance. *Id.* Dr. Sandoz also noted her associated tinnitus and back pain and that she was taking medication on a daily basis to control her headache and pain. *Id.* Dr. Sandoz indicated Plaintiff had muscle spasm in her cervical and lumbar spine, experienced mild pain with motion in her cervical spine, and experienced moderate pain with motion in her lumbar spine. Tr. at 547. He assessed posttrauma headache, lumbar disc displacement, other and unspecified disc disorder of cervical radiculopathy, and dizziness. *Id.* He prescribed Imitrex, Tramadol, and Elavil for her pain and noted she needed to take the Tramadol on a daily. *Id.* Dr. Sandoz stated Plaintiff had achieved maximum medical improvement for her headache and lumbar and cervical disc disease. *Id.* He

said one other option for her headache might be Botox and indicated she needed a functional capacity evaluation ("FCE"). He noted awaiting a neuropsychological exam. *Id.*

On February 17, 2014, Tracy Hill ("Ms. Hill"), a physical therapist at Columbia Rehabilitation Clinic, performed an FCE. Tr. at 573–594. Plaintiff reported an initial pain level of 5/10. Tr. at 573. Her highest pain level during the exam was an 8/10 with lifting. *Id.* Ms. Hill found Plaintiff could meet the demands of limited sedentary to limited light work. *Id.* Plaintiff tolerated occasional walking, stairclimbing, kneeling, bending, and reaching. *Id.* She did not tolerate occasional squatting or twisting. *Id.* Plaintiff could lift 9 to 14 pounds at various heights on an occasional basis, carry 13 pounds with two hands; carry 9 pounds in each hand, and push and pull 10 pounds loaded in a sled. *Id.* Plaintiff reported a sitting tolerance of 45 minutes, a standing tolerance of at least 15 minutes, and a standing/walking tolerance of at least 30 minutes. *Id.* Ms. Hill observed Plaintiff to sit for a maximal time of 15 minutes, stand for a maximal time of 13 minutes, and stand/walk for a maximal time of 17 minutes. *Id.* Plaintiff's cervical and lumbar ROM were limited. *Id.* The results of Plaintiff's treadmill test placed her in the fair classification of aerobic capacity and her functional aerobic capacity qualified her for light work. *Id.* Ms. Hill noted Plaintiff put forth a consistent effort

during the evaluation and she had taken one Ultram two hours prior to testing and took an Ultram one hour and 40 minutes into testing. *Id.*

On May 9, 2014, Plaintiff underwent a neuropsychological evaluation, performed by Dr. Nicholas Lind ("Dr. Lind"). Tr. at 596–615. Plaintiff reported experiencing headaches since her March 2013 injury with an intensity of 8/10 without medication and 3/10 with medication. Tr. at 608. She also reported decreased sleep, ability to engage in previously enjoyed activities, energy, and concentration, but denied feelings of guilt or changes in appetite, irritability, or sex drive. Tr. at 609. Plaintiff acknowledged apprehension about returning to work, but denied any PTSD symptoms. *Id.* She noted a change in her speech pattern after her injury and reported forgetfulness and eye fatigue when reading. *Id.* Plaintiff reported injuring her neck and lower back in an automobile accident approximately 30 years prior to the evaluation, but denied any dizziness, headaches, or difficulty thinking associated with it or any other accident. *Id.* She stated she was diagnosed with high blood pressure three or four years prior to her injury and indicated her high blood pressure was controlled with medication. *Id.* She denied a history of seizures, but reported involuntary facial twitches since the injury. *Id.* Dr. Lind indicated Plaintiff's mental status appeared normal. *Id.*

Psychological tests revealed Plaintiff experienced mild levels of depression, moderate levels of anxiety, had borderline intellectual functioning with a full scale IQ of 77, and demonstrated impaired attention and impulse control and impaired motor coordination. Tr. at 609–10.

Dr. Lind diagnosed adjustment disorder with mixed anxiety and depressed mood. Tr. at 611. He stated the results of the testing suggested mild depression and moderate anxiety. *Id.* The estimate of premorbid functioning suggested borderline abilities, but that measure was limited due to Plaintiff's poor academic performance and opportunities. *Id.* He noted Plaintiff's borderline memory for visual information may be due to her head injury, but opined it was not significantly disabling. *Id.* Dr. Lind found Plaintiff had met maximum medical improvement for any psychological symptoms associated with her injury and recommended she continue to use Elavil for as long as her pain persisted. *Id.* He concluded there were no mental health contraindications for Plaintiff to work in any capacity for which she was otherwise qualified. *Id.*

On June 24, 2014, Plaintiff returned to Dr. Sandoz for an evaluation of her back pain, headache, neck pain, and memory loss. Tr. at 626–29. Plaintiff reported persistent moderate to severe pain in her lower back, radiating to the right calf and foot. Tr. at 629. She said her symptoms were aggravated by

daily activities and relieved by pain medication. *Id.* Plaintiff described her headaches as constant, moderate to severe pressure and throbbing. *Id.* She indicated occipital pain radiating anteriorly aggravated by anxiety, head position, and noise and relieved by prescription drugs. *Id.* She reported associated symptoms of dizziness, memory impairment, neck stiffness, neurological symptoms, and vertigo. *Id.* Plaintiff indicated her neck pain had improved and described it as moderate, constant aching and burning in her bilateral posterior neck and radiating to her upper arms. *Id.* Plaintiff stated her symptoms were aggravated by flexion, hyperextension, pushing, walking, and working and were relieved by narcotic analgesics. *Id.* She reported associated symptoms of difficulty sleeping, muscle spasm, numbness, and tenderness, but denied bladder retention. *Id.* Plaintiff also complained of moderate memory loss, with associated symptoms of behavioral changes, dizziness, headache, neck stiffness, paresthesia, sleep disturbances, speech difficulty, and tingling. *Id.* Dr. Sandoz assessed post-trauma headache, displacement of cervical intervertebral disc without myelopathy, late effect of intracranial injury without mention of skull fracture, and sciatica due to displacement of lumbar disc. Tr. at 627–28. He instructed Plaintiff to continue taking tramadol and amitriptyline for her headaches and stressed compliance with taking the medication. Tr. at 627. For her cervical disc

displacement, Dr. Sandoz noted Plaintiff should continue with her medication and conservative therapy. *Id.* He noted Plaintiff was not a candidate for an epidural steroid injection because of her diabetes and instructed her to continue using Lidoderm patches. *Id.* Dr. Sandoz noted there was no surgical pathology for Plaintiff's sciatica, that she was not a candidate for an epidural steroid injection, and that he had ruled out medications. *Id.* Dr. Sandoz indicated Plaintiff had reached maximum medical improvement for her headache, neck pain, and lower back pain. Tr. at 627–28. He referred Plaintiff to counseling for her intracranial injury and resulting depressive symptoms. Tr. at 628.

On August 24, 2014, Plaintiff participated in an employability analysis by Cassandra L. Townsend ("Ms. Townsend"), a Vocational Rehabilitation Consultant. Tr. at 630–48. Plaintiff stated her last day on the payroll at her previous job was June 20, 2013, and she was terminated on November 1, 2013. Tr. at 630. Plaintiff reported taking Tramadol, Elavil, Imitrex, Lidocaine patches, Synthroid, Benazepril/HCTZ, Albuterol inhaler, Symbicort, baby aspirin, and Metformin. Tr. at 635. She complained of a constant right frontal headache somewhat decreased by pain medication. *Id.* At the beginning of the assessment, Plaintiff rated her headache pain 4/10 and a 6/10 at the end. *Id.* Plaintiff reported a constant ringing in her right

ear and indicated ENT testing had demonstrated right ear hearing loss. *Id.* Plaintiff complained of pain in the back of her right hip and thigh, running down to the second toe, which was numb. Tr. at 636. She rated that pain a 6/10 toward the beginning of the assessment and a 7/10 toward the end of the assessment and reported experiencing a gait change. *Id.* Plaintiff complained of a shooting pain starting at the center of her back and radiating to the right side that progressively worsened with sitting. *Id.* She rated this pain 3/10 toward the beginning of the assessment and 4/10 toward the end of the assessment. *Id.* Plaintiff complained of a pressure-like pain, strain, and constant tightness in her neck that she rated an 8/10 and 6/10. *Id.* She reported aching in both shoulders, rated 3/10 toward the beginning of the assessment and 4/10 toward the end. *Id.* She stated she had developed a facial twitch on both sides of her face. *Id.* She reported experiencing blurry vision, dizziness, leg weakness, fatigue, and ringing in her right ear. *Id.* Plaintiff reported difficulty maintaining concentration, lack of motivation, slowed mental processing, difficulty remembering little and important things, losing track of time, being easily distracted, and communicating more slowly, as well as grasping for words. *Id.* Plaintiff also reported changes in her emotions and behaviors, including writing notes to herself, but then losing them, losing track of conversations, being easily annoyed by others, forgetting

to turn off the stove, being short-tempered, experiencing impaired sleep, feeling more angry than usual, feeling down and depressed, feeling irritable and anxious, feeling impatient, experiencing a lower libido, and feeling easily overwhelmed. *Id.*

Plaintiff denied participating in any form of home exercise program, but reported using the following self-help techniques: using a horseshoe neck pillow for sleep; sleeping with a pillow between her knees; applying an ice pack to her neck, head, and right hip; using her TENS unit twice a day on her back, neck, and thigh; engaging in hot bath soaks and hot showers; and stretching with bands. *Id.*

Plaintiff described her quality of sleep as poor and interrupted. Tr. at 637. She reported waking up an average of three times each night and denied a history of obstructive sleep apnea. *Id.* Plaintiff indicated she mostly took care of herself independently, but needed assistance with washing and styling her hair. *Id.* She performed minimal household chores, including making her bed, preparing meals, doing laundry, and changing her bed linens. *Id.* She said she could drive approximately 30 minutes before requiring a rest break, but could remain in a vehicle longer if riding as a passenger. *Id.* Plaintiff reported no longer enjoying reading because she could not find a comfortable position and had trouble concentrating, decreased

church attendance, and less frequent visits with friends and family. *Id.* She indicated her typical day consists of getting up, taking a shower, eating cereal for breakfast, sitting in a lounge chair, watching television, listening to the radio, sitting on the porch, attending appointments, going to the market occasionally for small items, resting, taking medications, applying her TENS unit midday, and occasionally attending town meetings on her better days. *Id.*

Plaintiff reported the need to wear trifocal lenses; significant challenges with reading comprehension and concentration; deficiency in hearing in her right ear; slowed and less articulate speech; discomfort lifting a gallon of milk; ability to stand for 10 to 15 minutes; ability to walk for approximately 20 minutes; ability to sit for approximately 30 minutes; avoiding steps, stooping and squatting, bending and twisting, and reaching up and out; not attempting kneeling; ability to comprehend general social communication for short periods of time; and feeling off balance and if her her right leg would give way. Tr. at 637–38.

Ms. Townsend administered the Wide Range Achievement Test ("WRAT"). Tr. at 641. Plaintiff achieved below average to average scores in word reading, sentence comprehension, math computation, and reading composite. *Id.* She was able to pronounce five letter words and correctly

perform mathematics calculations, including addition, subtraction, sequencing, multiplication, division, rounding, and simple algebra. *Id.*

After reviewing medical opinions from Plaintiff's doctors and conducting her clinical interview, Ms. Townsend concluded Plaintiff's physical capacity range fell within the sedentary to light physical demand category. Tr. at 644. She also opined Plaintiff had experienced an extensive degree of loss in transferable occupations as a result of her injuries. Tr. at 646. She noted Plaintiff demonstrated positive work placement features, such as her high school diploma and education in nursing, ability to gain employment throughout her adult years, reliable transportation, and her academic achievement levels in the below average to average range. *Id.* Ms. Townsend also noted Plaintiff's negative placement features included her residence in a county with an unemployment rate higher than the national and state average, borderline tested intelligence, and her dependence on Tramadol, Lidocaine patches, Elavil, and Imitrex. Tr. at 647. Ms. Townsend also noted Plaintiff had been terminated from two positions and would have to deal with the stigma attached to those terminations. She also noted Plaintiff's history of arrest and pending jury trial. *Id.*

Ms. Townsend opined Plaintiff's injuries significantly jeopardized her employability and that she should consider participating in services offered

by the South Carolina Vocational Rehabilitation Department. *Id.* She stated if Plaintiff's symptoms improved, she was deemed eligible for services, and if she successfully addressed her chronic pain and stamina concerns, she may become employable as a customer complaint clerk. Tr. at 648. Ms. Townsend said Plaintiff would need to improve her ability to deal with stress and have more cognitive clarity, which may require that she participate in psychotherapy to help control the impact of stress on her pain. *Id.*

On November 18, 2014, Plaintiff returned to Dr. Sandoz with complaints of headache and dizziness. Tr. at 680–82. She described her headache pain as moderate to severe and her dizziness as moderate. Tr. at 680. Dr. Sandoz did not find any abnormalities in his physical exam. Tr. at 681. He assessed posttrauma headache, displacement of cervical intervertebral disc without myelopathy, dizziness, and late effect of intracranial injury without mention of skull fracture. *Id.* Plaintiff reported no significant improvement with Tramadol, but indicated she had been taking codeine for a cough that was also improving her headache and neck pain. *Id.* Dr. Sandoz prescribed Tylenol with codeine. *Id.* He attributed her dizziness to inner ear damage and instructed Plaintiff to continue with meclizine and exercises. *Id.* He noted awaiting input from psychiatry on Plaintiff's intracranial injury and resulting symptoms. *Id.*

On November 21, 2014, Dr. Sandoz gave sworn testimony regarding Plaintiff's medical treatment in connection with her workers compensation claim. Tr. at 746–60. At some point during Plaintiff's treatment, she reported difficulty performing her activities of daily living (ADLs"), which prompted Dr. Sandoz to recommend a psychiatric and neuropsychological evaluation to assess the possibility of underlying depression, trauma, or traumatic brain injury. Tr. at 748. He testified all of the conditions he was treating were controlled with treatment or were at maximum medical improvement. Tr. at 748, 750. He opined Plaintiff had suffered a brain injury to the bilateral frontal region, despite a lack of evidence on CT or MRI. Tr. at 752.

On December 8, 2014, Plaintiff followed up with Dr. Acaylar on her lab results and hypertension and for a refill of Symbicort. Tr. at 726–29. He noted her chronic headache was stable with her current medication, her diabetes was controlled, her exudative pharyngitis was resolved, and her hypertension was controlled. *Id.* He prescribed Janumet for diabetes, Exforge for hypertension, Dexilant for GERD, and Flagyl for the H. pylori infection. *Id.*

On February 27, 2015, Dr. Sandoz treated Plaintiff for headaches. Tr. at 677–79. Plaintiff reported her headaches were worse, occurring daily, and moderate to severe. Tr. at 677. She indicated her symptoms were aggravated

38

by exercise, head position, noise, and stress, and she denied any relieving factors. *Id.* Plaintiff reported associated symptoms of blurred vision, dizziness, memory impairment, neck stiffness, neurological symptoms, performance changes, photophobia, visual aura, and paresthesia. *Id.* Dr. Sandoz assessed posttrauma headache, displacement of cervical intervertebral disc without myelopathy, late effect of intracranial injury without mention of skull fracture, and sciatica due to displacement of lumbar disc. Tr. at 678. He noted her therapy was not relieving her pain symptoms, and he prescribed gabapentin. *Id.*

On April 13, 2015, Plaintiff followed-up with Dr. Acaylar regarding her diabetes. Tr. at 716–18. Plaintiff complained of depression and numbness in her right toes. Tr. at 716. She reported she had not been taking the Kazano for her diabetes and did not want to take anything with metformin. *Id.* Dr. Acaylar noted Plaintiff presented with depressed mood, difficulty falling and staying asleep, excessive worry, and restlessness. *Id.* He also noted Plaintiff had not taken her blood pressure medication that day. Tr. at 717. He assessed uncontrolled hypertension, uncontrolled diabetes mellitus, and GERD. Tr. at 716. He prescribed benazepril for hypertension and indicated she should follow up again in two months. *Id.* He prescribed Actos and Glipizide for diabetes. *Id.*

On May 18, 2015, Plaintiff returned to Dr. Sandoz regarding her memory loss, neck pain, and headache. Tr. at 673–76. She described experiencing behavioral changes, difficulty with ADLs, falling, headache, neck stiffness, restlessness, and sleep disturbances. Tr. at 673. She denied agitation, ataxia, bladder incontinence, bowel dysfunction, chorea, confusion, dizziness, fever, gait disturbances, hallucinations, hyperacusis, mood swings, paresthesia, personality change, speech difficulty, tingling, tremors, and visual disturbances. *Id.* She also reported going into rooms and not knowing why she went there and having gone to places she did not know how. *Id.*

Plaintiff reported her neck pain was moderate and had worsened. *Id.* She described the pain as aching, occurring daily, located in the bilateral posterior neck, and radiating to both upper arms. *Id.* She indicated the pain was aggravated by driving, exertion, flexion, hyperextension, pushing, rotation, walking, and working. *Id.* Plaintiff denied any relieving factors. *Id.* She described experiencing difficulty sleeping, muscle spasm, numbness, tenderness, tingling, and weakness in her neck. *Id.* She denied experiencing bladder dysfunction not spinal related, bladder incontinence, bladder retention, bowel dysfunction not spinal related, bowel incontinence, bowel retention, decreased mobility, dermatomic rash, dysphagia, incoordination,

joint pain, loss of balance, muscle atrophy, rash, sexual dysfunction, and weight loss. *Id.*

Plaintiff described her headache as pressure and squeezing on the frontal left, frontal right, and occipital that was aggravated by head position and could be relieved with prescription drugs. *Id.* She indicated that she experienced daily, worsening headaches daily and the condition had worsened. *Id.* She reported experiencing memory impairment and neck stiffness associated with the headaches. *Id.* She denied experiencing associated dizziness, fever, and personality change. *Id.*

Dr. Sandoz noted Plaintiff had a muscle spasm in her cervical spine and was in moderate distress, but found no other abnormalities on physical examination. Tr. at 675. He assessed post-trauma headache, other and unspecified disc disorder of cervical region, sciatica due to displacement of lumbar disc, and late effect of intracranial injury without mention of skull fracture. *Id.* Plaintiff reported gabapentin had not helped, so Dr. Sandoz indicated she should wean off of gabapentin and start diclofenac. *Id.* He ordered an MRI of Plaintiff's cervical spine and somatosensory testing of both arms and legs. *Id.* He noted Plaintiff's sciatica was causing left leg pain and her hip pain had worsened. *Id.* He indicated he would set up an orthopedic consultation. *Id.* Dr. Sandoz also noted he would review Plaintiff's new

neuropsychological evaluation to adjust her medications or begin a psychotherapy trial. *Id.*

On May 22, 2015, Dr. Lind testified regarding Plaintiff's treatment in connection with her workers' compensation claim. Tr. at 761–92. He testified people who experience chronic pain and anxiety are more likely to experience inattention than people with organic brain injuries. Tr. at 764. He walked the attorneys through his report and each test performed. Tr. at 765–775. Dr. Lind stated he thought Plaintiff's low intelligence score was attributable to pain and anxiety. Tr. at 774.

On May 29, 2015, Dr. James Thesing ("Dr. Thesing") administered an MRI of Plaintiff's cervical spine. Tr. at 671–72. Dr. Thesing found incidental demonstration of mild to moderate mucosal thickening in the maxillary sinuses; heterogeneous enlargement of the left thyroid lobe; mild modic endplate changes with vertebral body marrow signal, which he noted was normal for Plaintiff's age; mild to moderate facet arthropathy throughout; severe DDD at C5–6; and mild to moderate DDD at C4–5 and C6–7. Tr. at 671. He found a tiny central disc protrusion at C2–3 and no stenosis. *Id.* At C3–4, he found a minimal disc bulge with no stenosis. *Id.* At C4–5, he found the presence of a shallow central disc osteophyte complex and more prominent left central endplate osteophytes that merged with uncovertebral

hypertrophy to produce severe left C5 neural foraminal stenosis. *Id.* He indicated there was mild central canal and no right neural foraminal stenosis at that level. *Id.* At C5–6, he found mild posterior discovertebral ridging, predominantly bony with mild central canal stenosis asymmetric to the right. *Id.* He indicated prominent uncovertebral hypertrophy resulted in moderate right and mild left neural foraminal stenosis. At C6–7, he found a small central disc protrusion and mild disc bulge. *Id.* He indicated there was no central canal stenosis and mild left and no right neural foraminal stenosis at that level. *Id.* At C7–T1, he found the disc was intact and no stenosis. *Id.*

Dr. Thesing's impression included mild central canal and severe left neural foraminal stenosis at C4–5; severe DDD at C5–6, with mild central canal stenosis asymmetric to the right with moderate right and mild left neural forminal stenosis; and small central disc protrusion at C6–7 without central canal stenosis and with mild left C7 foraminal stenosis. Tr. at 671–72.

On October 8, 2015, Plaintiff followed up with Dr. Sandoz about her headaches. Tr. at 668–70. Plaintiff described her headache pain as pressure, squeezing, and throbbing located on the frontal right and ocular right with posterior radiation. Tr. at 668. She indicated her symptoms were aggravated by exercise, head position, noise, and stress and relieved by prescription medication. *Id.* She reported experiencing associated neck stiffness and

43

photophobia and denied experiencing blurred vision, clear sinus drainage, dizziness, double vision, fever, hemianopsia, loss of consciousness, memory impairment, nausea, neurological symptoms, performance changes, personality change, phonophobia, scintillations, scotoma, upper respiratory infection like symptoms, vertigo, vision loss, and vomiting. *Id.*

Dr. Sandoz found Plaintiff was moderately distressed, obese, had a muscle spasm in her cervical spine, and seemed depressed. Tr. at 669–70. He assessed chronic posttraumatic headache, not intractable, and noted Plaintiff was doing fair with her medications, which included Imitrex, Lidoderm patches, and diclofenac. Tr. at 670. He stressed compliance with taking medicine, indicated Plaintiff should continue with therapy, and noted he may consider an MRI if her symptoms persisted. *Id.*

On November 17, 2015, returned to Dr. Acaylar for a follow-up appointment regarding her diabetes, hypertension, and joint pain. Tr. at 696–700. Dr. Acaylar indicated Plaintiff's diabetes was stable and she was compliant with her medications and following up. Tr. at 697. He added Plaintiff's sedentary lifestyle to her list of diabetes risk factors. *Id.* Plaintiff reported taking her hypertension medication, but stated she had not taken it that day. *Id.* Dr. Acaylar indicated her hypertension was stable. *Id.* Plaintiff reported a constant, fluctuating ache and dull pain in her neck and hips,

without radiation. *Id.* She stated her pain was aggravated by movement, walking, and standing and not relieved by anything. *Id.* She reported experiencing associated decreased mobility and limping and denied joint instability, numbness, spasms, swelling, tingling in the arms or legs, and weakness. *Id.*

Dr. Acaylar examined Plaintiff and found her cervical spine was tender and she had mild pain with motion. Tr. at 699. Plaintiff experienced mild tenderness in her lumbar spine and had mildly-reduced ROM. *Id.* Plaintiff had weak left hip muscles, no tenderness on the right, moderately reduced ROM on the left, and mildly reduced ROM on the right. *Id.* Dr. Acaylar assessed uncomplicated type 2 diabetes mellitus, uncontrolled hypertension, cervicalgia, and chronic hip pain. Tr. at 696. He noted Plaintiff was receiving bloodwork that day, counseled Plaintiff on diet and exercise, recommended physical therapy for Plaintiff's neck pain, and increased Plaintiff's tramadol dosage for her hip pain. *Id.*

On January 18, 2016, Plaintiff returned to Dr. Sandoz for evaluation of her back pain and headaches. Tr. at 806–09. She reported worsening sharp, tingling pain in her back radiating to her buttocks. Tr. at 807. She indicated her pain was aggravated by movement, positioning, twisting, flexing, and extending and relieved by rest, changing position, and medication. *Id.* She

reported experiencing associated symptoms of numbness of the legs and feet and tingling. *Id.* Plaintiff reported experiencing the following symptoms associated with her head injury: loss of consciousness, headache, dizziness, blurred vision, balance problems, sensitivity to noise, feeling slowed down, difficulty concentrating, difficulty remembering, confusion, irritability, and feeling more emotional. *Id.* Plaintiff reported muscle aches, muscle weakness, arthralgia and joint pain, back pain, depression, and sleep disturbance. *Id.*

Dr. Sandoz noted Plaintiff was obese, depressed, experienced tenderness and decreased ROM in her cervical spine, expressed pain with flexion and extension, and had decreased ROM in her low back. Tr. at 807–08. Dr. Sandoz assessed chronic posttraumatic headache, traumatic brain injury, late effect of traumatic injury to brain, and lumbar spondylosis. Tr. at 808. He instructed Plaintiff to continue her medications, and encouraged her to exercise more. *Id.* He noted he made Plaintiff aware that noncompliance with therapy would result in discharge and not providing any further treatment with medication. *Id.* He placed her on light duty restrictions with no prolonged bending, reaching, stooping, twisting, or sitting more than 30 minutes to one hour. *Id.* He also included a weight restriction of 20 pounds. *Id.*

On February 4, 2016, Plaintiff followed up with Dr. Acaylar regarding her diabetes, hypertension, chronic hip pain, and neck pain. Tr. at 692–95. Dr. Acaylar noted Plaintiff's hypertension and diabetes were stable and she was not experiencing any new problems associated with her chronic hip pain. Tr. at 693. Plaintiff reported moderate sharp, throbbing pain in the bilateral posterior neck. *Id.* She also complained of some hearing loss with tinnitus in the right ear and asked to see an ENT. *Id.* Dr. Acaylar examined Plaintiff and found mildly reduced ROM in her cervical spine, tenderness and moderately reduced ROM in her lumbar spine, and weak hip muscles bilaterally. Tr. at 694. He assessed tinnitus, hearing loss, cervicalgia, uncomplicated type 2 diabetes mellitus, and uncontrolled hypertension. Tr. at 692. He referred Plaintiff to an ENT and to Otolaryngology for the tinnitus and hearing loss. *Id.* Plaintiff did not want to use Actos for her diabetes, so Dr. Acaylar stopped Actos and increased her Glipizide. *Id.* He noted if her diabetes was still not controlled, he would add Januvia. *Id.*

On April 18, 2016, Plaintiff returned to Dr. Sandoz, who evaluated her for back pain, head injury, headache, and neck pain. Tr. at 802–04. Plaintiff reported the symptoms from her head injury increased with physical and mental activity. Tr. at 803. She reported her headache pain was 8/10, throbbing, pounding, sharp, and stabbing and indicated associated symptoms

of nausea and sensitivity to light. *Id.* She noted she was under stress. *Id.* Plaintiff reported burning, sharp pain in her neck with numbness, tingling, pain, and weakness in the arms. *Id.* Dr. Sandoz found Plaintiff was obese, depressed, had tenderness and decreased ROM in her cervical spine, and had pain with extension and flexion and decreased ROM in her low back. *Id.* He continued to assess chromic post-traumatic headache, traumatic brain injury, late effect of traumatic injury to brain, and lumbar spondylosis. Tr. at 804. He noted her low back pain was not being controlled with Tramadol, prescribed Nucynta, and instructed Plaintiff to continue taking Meloxicam. *Id.*

On May 18, 2016, Plaintiff had a follow-up appointment with Dr. Acaylar regarding her diabetes, hypertension, headaches, neck pain, and hyperlipidemia. Tr. at 819–23. Dr. Acaylar noted Plaintiff's diabetes was stable and her hypertension was worsening. Tr. at 820. Plaintiff reported moderate headaches and denied aggravating or relieving factors. *Id.* She described her neck pain as moderate and unchanged. *Id.* Dr. Acaylar indicated Plaintiff was adhering to her medication and follow-up instructions for her hyperlipidemia and diabetes, but not adhering to diet and exercise instructions for either. *Id.* On examination, he found Plaintiff appeared anxious and had mild pain with motion in her cervical spine. Tr. at 822. Dr.

Acaylar assessed uncomplicated type 2 diabetes mellitus, uncontrolled hypertension, cervicalgia, intractable migraine without status migrainosus, and unspecified hyperlipidemia. Tr. at 819. He indicated he suspected Plaintiff's neck pain was anxiety-related. *Id.* He prescribed Zecuity for her headaches, noted she was receiving bloodwork that day, and continued Plaintiff on her medications. *Id.*

On August 12, 2015, December 16, 2015, May 19, 2016, and June 21, 2016, Plaintiff underwent a neuropsychological evaluation by Dr. Alexandr Sasha Federer ("Dr. Federer"). Tr. at 793–98. Plaintiff reported experiencing a half a minute of retrograde amnesia and two minutes of anterograde amnesia directly after her injury. Tr. at 793. She reported ongoing posttraumatic headaches, which she rated 8/10; constant pain in her back, leg, and neck; ringing in her ear; blurry vision; insomnia; and problems with her short-term memory, concentration, and ability to focus. *Id.* Subjectively, Plaintiff stated she felt she was 40% of her previous self. *Id.* She reported experiencing anhedonia, depression, increased irritation, fatigue, and social isolation. *Id.* Dr. Federer described Plaintiff's mood as low-grade depression and stated her main preoccupation and limitation was her high pain level. *Id.*

Dr. Federer stated Plaintiff had difficulty with pain limitations and had to cancel appointments because of her level of pain that day. Tr. at 794. He

noted Plaintiff's ability to sustain attention for longer periods of time was limited due to the pain she was experiencing. *Id.* Plaintiff frequently had to get out of the chair and walk to regulate her pain. *Id.* Also, Plaintiff's neck pain increased when she had to sustain focus on paper and pencil tasks. *Id.* Plaintiff presented with an adequate effort and did not show signs of malingering. *Id.* During the evaluation, Plaintiff did not present with any thought disorder, her sensorium was clear, her speech was fluent and goal oriented, and her mood was somewhat depressed, but she did not present with heightened anxiety. *Id.* Plaintiff was pessimistic and anxious about her future and her ability to return to a more functional status. *Id.* She expressed frustration with the lack of treatment she had received and her difficulties working with the workman's compensation program. *Id.*

Dr. Federer administered the Weschler Adult Intelligence Scale – Edition IV ("WAIS-IV"). Tr. at 795–96. He noted that this is the same test Dr. Lind administered one year prior during his evaluation and compared the results. Tr. at 796. Dr. Federer found Plaintiff's IQ to be in the low to average range, whereas Dr. Lind found her to be in the borderline range. *Id.* Dr. Federer stated the discrepancy could have resulted from Dr. Lind's administration of all his testing in one day and Plaintiff's consequent fatigue, pain, and difficulty sustaining her efforts. *Id.* The greatest difference in the

results was in Plaintiff's processing speed, where Plaintiff scored low to average. *Id.* Dr. Federer noted processing speed is influenced by depression, experiencing pain, and medication, but also, is known to be the most sensitive indicator of brain injury. *Id.* He indicated the most telling and realistic sign of Plaintiff's intellectual functioning prior to her accident were the jobs she maintained in her adult years. *Id.* He found it quite likely that Plaintiff would have gained one more point, bumping her up to average intelligence, if she had experienced less stress and pain on the day of her testing. Tr. at 797.

To assess Plaintiff's memory, Dr. Federer administered the California Verbal Learning Test – Second Edition. *Id.* Plaintiff's memory performance was lower than when it was tested by Dr. Lind. *Id.* Plaintiff demonstrated poor auditory attention span, which Dr. Federer suggested could be the result of her head injury and/ or depression. *Id.* Plaintiff had a good learning curve, even though it was in the low or below average range. *Id.* Plaintiff's long recall was within the normal range. *Id.* However, Plaintiff did not demonstrate semantic clustering, which usually assists with the quality of recall. *Id.* She had good effort in learning the task, and there were no indications of malingering on her memory performance. *Id.* Plaintiff's memory self-rating scale results were worse than her actual performance. *Id.* Plaintiff perceived that her memory on the whole is much worse than it ever

has been, and she had very serious concerns about her memory performance. *Id.* Dr. Federer indicated this was likely a reflection of her depression and negative self-evaluation resulting from her injury. *Id.*

Dr. Federer used the Personality Assessment Inventory, Beck Depression Inventory, and Structured Inventory of Malingered Symptomatology ("SIMS") to evaluate Plaintiff's psychological functioning. *Id.* These instruments indicated Plaintiff was experiencing significant distress and was particularly concerned about her physical functioning. *Id.* She saw her life as severely disrupted by a variety of physical problems and reported a number of difficulties, consistent with significant depressive experience. *Id.* Plaintiff's depression seemed to manifest itself in affective and physiological signs of depression. *Id.* Plaintiff admitted to feelings of sadness, loss of interest in normal activities, and loss of sense of pleasure in things that she previously enjoyed. *Id.* Plaintiff also showed disturbance in her sleep patterns, decreased energy level and sexual interest, and loss of appetite. *Id.* The tests indicated psychomotor slowing. *Id.* The data obtained from SIMS did not indicate malingering or exaggeration of psychiatric symptoms. Tr. at 797–98. Plaintiff had a higher elevation of symptoms of amnestic disorder, correlating with her own perception that her memory difficulties are greater than objective measurements suggest. Tr. at 798.

Dr. Federer concluded the intellectual testing indicated there had been some mild recovery in Plaintiff's cognitive status. However, he stated Plaintiff's IQ was lower than one would expect given her previous academic and vocational accomplishments. *Id.* Dr. Federer stated Plaintiff's psychological status had deteriorated with the prolonged coping with pain and resulting depression. *Id.* It was not possible for him to discern which of the cognitive difficulties in her functioning resulted from the head injury and which resulted from pain and depression. *Id.* He noted one would expect recovery within a year from a mild head injury and would not expect persistent cognitive deficits. *Id.* Dr. Federer opined Plaintiff's status had clearly changed since her injury and she would not be able to sustain work-related activities for any long period of time. *Id.* He stated Plaintiff's low processing speed would be detrimental in functioning in such a high demand profession as nursing, where physical and mental dexterity is required to perform the profession safely. *Id.* He recommended pain management and individual psychotherapy for her depression. *Id.*

On July 13, 2016, Plaintiff returned to Dr. Sandoz for a follow-up appointment regarding her back pain, head injury, headache, and neck pain. Tr. at 799–801. Plaintiff reported the right side of her back seemed to be getting worse and that her neck was still hurting. Tr. at 800. Plaintiff's blood

pressure was 159/87 and her weight was 230 pounds. *Id.* Dr. Sandoz continued his assessment of traumatic brain injury, chronic posttraumatic brain injury, lumbar spondylosis, and cervical spondylosis. Tr. at 800–01. He noted he was awaiting a cervical spine MRI and instructed Plaintiff to continue her current medications. Tr. at 801.

On August 25, 2016, Dr. Acaylar followed up on Plaintiff's diabetes and hypertension and evaluated Plaintiff for complaints of chest discomfort and asthma. Tr. at 810–14. He noted Plaintiff's diabetes and hypertension were stable. Tr. at 811. Plaintiff described her chest discomfort as minimal and stated her symptoms had improved. *Id.* She did not complain of any pain and reported the discomfort was associated with headache and myalgia. *Id.* Dr. Acaylar stated Plaintiff's asthma was allergic and seasonal and her symptoms had stabilized. *Id.* Dr. Acaylar assessed uncontrolled hypertension, unspecified hyperlipidemia, GERD without esophagitis, unspecified chest pain, uncomplicated asthma, uncontrolled type 2 diabetes mellitus without complication, and myalgia. Tr. at 810. He switched Plaintiff to amlodipine with valsartan for hypertension; prescribed omeprazole for GERD; performed an ECG and stress test and stated the chest pain was likely GERD; switched her back to Symbicort for asthma, per her request; and referred her to Ophthalmology for diabetic eye care. *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on October 11, 2016, Plaintiff testified she last worked answering the telephone. Tr. at 39–40. She said she worked as an LPN at the PD Center for Disability, Bayada Nurse, and Nurse Finders. Tr. at 40. At GEICO, she was an insurance claims representative, processing medical claims in a sedentary setting. *Id.* She said she would carry at the most a couple of files and spent a lot of time on the phone and the computer analyzing claims. Tr. at 41. Plaintiff stated she is being treated by Dr. Sandoz and goes to HopeHealth. *Id.* Plaintiff testified she took a few liberal arts courses, but did not obtain a degree other than an LPN. Tr. at 42.

Plaintiff said that she has her driver's license, but can only drive for short distances and time because she is fearful of being someplace and not remembering where she was, as well as having discomfort from pain in her left shoulder, legs, thigh, back, and neck. *Id.*

She testified that she had a workplace injury on March 1, 2013, where she was attacked by a patient to whom she was dispensing medication. Tr. at 43. She testified she had staples placed in her head, her neck and back hurt, and she had a hematoma for a long time. Tr. at 43–44. She testified that

three years later, she still has neck and back pain. Tr. at 44. She said she can never get rid of her pain, but obtains short-term relief from lying down and taking medication. *Id.* Plaintiff said she sleeps a lot to reduce the pain. *Id.* She testified her pain limits her from doing her chores. Tr. at 44–45. She cannot stand for a long time when she cooks, is unable to lift objects, or do heavy chores. Tr. at 45. She said the heaviest object she can carry is a gallon of milk, but she has to carry it close to her to make it more comfortable. *Id.* She classified her pain in her neck most of the time as a 6 out of 10 and her pain in her back as 4 out of 10 with pain medicine. Tr. at 45–46. Plaintiff said her lower back hurts works when she sits, such that she can only sit for 15 to 20 minutes before it becomes more uncomfortable. *Id.* at 46. She testified that her walking is very changed, and she has a limping gait. *Id.* She testified she could only walk 20 minutes or so before she gets tired, has pain in her back and neck, and has to sit to relax. Tr. at 46–47. She said she could only stand in one place for 10 or 15 minutes. Tr. at 47. She stated she uses three lidocaine patches once a day. Tr. at 47–48. She also stated that she uses Nucynta once every eight hours, her TENS unit at least twice a day for 20 minutes on her lower back and her legs. Tr. at 48. She testified the Nucynta makes her very groggy and she sleeps for a half an hour to an hour after a Nucynta dose. Tr. at 48–49. Plaintiff testified she takes Sumatriptan, a

medication for migraines, which she gets at least once or twice a week that causes pounding across her forehead and nausea. Tr. at 49. She stated the migraines require her to lie down for two hours. Tr. at 50. She also stated she has had a constant headache since the injury, but it is not like the intermittent migraines. *Id.* Plaintiff testified that her injury affected her brain, including her memory, concentration, and focus. *Id.* She testified she is no longer able to do a lot of book reading as before, but she reads small newspaper and magazine articles, if at all. *Id.* She testified she was an avid reader, but that since her injury, it is painful to read for long because she cannot look down for more than a couple of minutes. Tr. at 50–51. She also stated she does not watch television much because shows are lengthy and she cannot get through a whole 30 to 60 minute show. Tr. at 51. She stated movies are "out of the question" because of her problems with focus, concentration, pain, and discomfort. *Id.*

Plaintiff testified she grows potted plants and can water them for about ten to fifteen minutes before taking a break. Tr. at 52. She said she usually falls asleep while taking a break. *Id.* She testified she can make light meals like simple soups or eggs, and tries to dust, but keeps the bed unmade because she is in and out of the bed. Tr. at 52–54. She said she lives alone and her sister and children help her around the house. Tr. at 53. She testified

her sister drove her to the hearing. *Id.* She said she does small loads, but the bigger pieces of laundry are done by her sister. *Id.*

Plaintiff testified she has asthma symptoms and uses two inhalers, one for colds and a daily inhaler to prevent trouble breathing. Tr. at 54. She stated she is not around smoke or heavy scent. *Id.* She estimated lying down for pain relief at least three or four times a day for twenty minutes to an hour each time. *Id.* She testified that she takes medication at night to sleep, but that she is still up and down every three hours or so because of soreness in her hip and legs. Tr. at 55. She is waiting for a referral to a specialist through worker's compensation. *Id.* She said her hip problem started on the left, but subsequently, both hips became involved. *Id.* Plaintiff testified that she also suffers from depression and feels worthless, unable to do the things that she used to do, and lacking energy. *Id.*

Aside from seeing her sister and doctor, Plaintiff testified that when she has a good day, she attends a church service once or rarely twice a month. Tr. at 55–56. She testified that she has ringing in her right ear that is a distracting nuisance and is not relieved with pain medication. Tr. at 56.

b.    Vocational Expert Testimony

Vocational Expert ("VE") J. Adger Brown, Jr., reviewed the record and testified at the hearing. Tr. at 57–60. The VE categorized Plaintiff's PRW as a

practical nurse as semi-skilled, SVP of 4, medium, *DOT* number 354.374-010; and an insurance clerk as skilled, SVP of 5, sedentary, *DOT* number 214.362.022. Tr. at 57. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work except no climbing ladders, ropes, or scaffolds; must avoid working at unprotected heights; must avoid concentrated exposure to smoke, fumes, odors, dust, gas, and poor ventilation. Tr. at 57. The VE testified that the hypothetical individual could perform Plaintiff's PRW. Tr. at 57–58.

The ALJ described a second hypothetical individual that was identical to the first hypothetical, except was limited to light work. The VE testified that the hypothetical individual could perform Plaintiff's PRW as an insurance agent, even with a sedentary limitation. Tr. at 58. If the hypothetical individual were off task for 20% of the eight-hour work day on a consistent basis, the VE testified there would be no jobs available. Tr. at 59.

In response to questions by Plaintiff's counsel, the VE testified that an individual needing a sit-stand option (alternating every 15 or 20 minutes with five minutes in between sitting and standing) would not be employable because the VE assumes a five minute break every 20 minutes. *Id.*

2.   The ALJ's Findings

In his decision dated March 2, 2017, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2018.
2.   The claimant has not engaged in substantial gainful activity since March 1, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.   The claimant has the following severe impairments: degenerative disc disease (DDD), asthma, and insulin dependent diabetes mellitus (IDDM) (20 CFR 404.1520(c)).
4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.   After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with some limitations. Due to postural limitations, the claimant cannot climb ladders, ropes, or scaffolds. Due to environmental limitations, the claimant must avoid working at unprotected heights. Additionally, the claimant must avoid concentrated exposure to smoke, fumes, odors, dust, gases, and poor ventilation.
6.   The claimant is capable of performing past relevant work as a practical nurse and insurance clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565).
7.   The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2013, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 13–27.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not correctly asses the severity of Plaintiff's physical and mental impairments or consider the combined effect of her impairments;

2)    the ALJ erred in finding Plaintiff had the RFC to perform light work because her physical and mental limitations and her inability to sustain work activity made her unable to perform this type of work;

3)    the ALJ erred in giving little weight to Plaintiff's treating medical providers;

4)    the ALJ's step 4 finding was ambiguous and his hypothetical question to the VE was insufficient;  and

5)    the ALJ erred in not proceeding to step 5.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform

---

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir.

1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Severity and Combination of Impairments

Plaintiff argues the ALJ erred in failing to find her depression/anxiety, memory problems, difficulties with concentration, and migraine headaches were severe impairments. [ECF No. 15 at 22]. Plaintiff further argues the ALJ failed to consider the combined effect of her impairments in determining her ability to work. *Id.* at 20–21.

The Commissioner argues Plaintiff's memory problems, headaches, neck pain, back pain, and mental health impairments were not severe. [ECF No. 16 at 22]. The Commissioner contends the ALJ considered all of Plaintiff's impairments in determining the RFC. *Id.*

A finding of a single severe impairment at step two of the sequential evaluation process is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ does not find an impairment severe at step two provided that he considers that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires the ALJ to consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp.

2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

However, "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792 (D.S.C. Aug. 28, 2012) citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995).

The ALJ found Plaintiff's severe impairments included DDD, asthma, and insulin dependent diabetes mellitus. Tr. at 15. He specified that hypothyroidism, migraine headaches, tinnitus, hypertension, and obesity were non-severe impairments, explaining that none of the medical records specified that these impairments caused any significant functional limitations, and the objective medical evidence indicated that these impartments were well treated. *Id.* Although the ALJ did not explicitly address whether Plaintiff's traumatic brain injury was a severe or non-severe impairment, he addressed this impairment in his decision, indicating Plaintiff's exanimation following her work injury and the diagnostic findings

from the MRI scans of her brain indicated normal, unremarkable, or mild findings. Tr. at 20–21, 23–24.

In addressing Plaintiff's depression and anxiety, her memory problems, and difficulty concentrating, considered singly and in combination, the ALJ found these impairments did not cause more than minimal limitations in the Plaintiff's ability to perform basic mental work activities and were therefore nonsevere. Tr. at 15. The ALJ found Plaintiff had no limitations in understanding, remembering or applying information; social functioning; concentration, persistence or pace; or ADLs explaining Plaintiff's medical records, function reports, and testimony did not support any limitations. Tr. at 16–17. The ALJ concluded that Plaintiff's mental impairments were nonsevere because they caused no more than mild limitations in any of the functional areas. Tr. at 17.

The ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. *Id.* The ALJ noted none of Plaintiff's treating or examining physicians have mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to any listing. Tr. at 17–18. The ALJ further explained he "considered the implied assertion from the claimant's

representative that the claimant has an intellectual disorder as contemplated by the revised Listing 12.05 (Intellectual Disorder)." Tr. at 18. The ALJ found

> there was no evidence that the claimant's 77 FSIQ manifested in childhood. Instead, her school records indicate higher functioning (Exhibit 17E). Additionally, the claimant testified that she worked as a licensed nurse for years, which also indicates higher functioning. Finally, the newly revised Listing 12.05 does not contemplate any FSIQ testing scores lower than 75, and even that must be accompanied by other deficits in adaptive functioning, which are not present here.

*Id.*

The undersigned finds the ALJ adequately assessed Plaintiff's severe and non-severe impairments. The ALJ provided a rational explanation for his conclusions as to which impairments were severe and which were not, explaining that some of Plaintiff's alleged impairments were not supported by documentary evidence and that others imposed no more than minimal limitations. *See* Tr. at 14–17.

The undersigned further finds the ALJ properly considered the combined effects of Plaintiff's impairments. A review of the decision as a whole indicates the ALJ considered all of Plaintiff's impairments and imposed restrictions based upon their individual and cumulative effects. Because the ALJ cited adequate evidence to support his finding that

Plaintiff's combination of impairments were not disabling, the undersigned finds the ALJ did not err in assessing the combined effect of Plaintiff's physical and mental impairments. *See* Tr. at 14–18.

2. RFC

A claimant's RFC represents the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a). It must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. *Id.* The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must determine the claimant's ability to perform work-related physical and mental abilities on a regular and continuing basis. *Id.* at *2. He must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

### a) Ability to Perform Light Work

Plaintiff argues the ALJ erred in concluding she was capable of performing light work. [ECF No. 15 at 22]. She maintains the ALJ did not consider the medical and vocational evidence and testimony that her pain is exacerbated by walking and standing. *Id.* at 22–23. Plaintiff further contends the ALJ erred in failing to include any mental limitations in his RFC. *Id.* at 24. Plaintiff argues the side effects of her medication, such as drowsiness, and her inability to focus and concentrate, together with her depression and anxiety, make her unable to complete work tasks. *Id.* Plaintiff states these limitations are supported by Drs. Sandoz, Lind, and Federer's treatment notes and Ms. Townsend and Mr. Brown's vocational reports and observations and should have been considered in her RFC. *Id.*

The Commissioner argues substantial evidence supports the ALJ's conclusion that Plaintiff had the ability to perform limited light work based on multiple medical opinions and vocational evidence. [ECF No. 16 at 23–28].

The ALJ noted Plaintiff testified she is fearful, depressed, and does not have much energy, and has difficulty remembering and concentrating due to her head injury. Tr. at 15. Plaintiff testified she lives independently, is able to drive short distances, perform light household chores, watch television, take care of her plants, visit with her sister and children, and attend church

services once or twice a month. Tr. at 15, 19. Plaintiff stated she has pain symptoms in her left shoulder, legs, thighs, back, and neck, and that she obtains short term relief from her symptoms by laying down and taking her medications, which make her groggy. Tr. at 19. Plaintiff further testified "she is able to carry a half gallon of milk, she is able to sit for 15–20 minutes before becoming uncomfortable, walk for 20 minutes with an unsteady gait, and stand for only 10 to 15 minutes due to pain in her back." *Id.*

The ALJ discussed the objective findings and medical opinions of record. *See* Tr. at 20–26. In March to May 2013, Dr. Perez-Garcia noted very minimal to no pain during Plaintiff's ROM examinations and she stated Plaintiff could return to desk work only. Tr. at 20. On March 6, 2013, Dr. Parke reviewed a CT scan of Plaintiff's head and he assessed Plaintiff with a left laceration fracture with no findings of posttraumatic contusion, mass, or hemorrhages intracranially, and no underlying hematoma or calvarial fracture. *Id.* On March 24, 2013, Dr. Burnett examined Plaintiff and found her unremarkable with normal gait. Tr. at 21. On March 27, 2013, Dr. Parke reviewed a MRI image of Plaintiff's lumbar spine and assessed her with no evidence of fracture or lumbar compressive discopathy, moderate thoracic degeneration at Tll-12 with mild foraminal narrowing due to disc bulging and spondylosis, and left sided mild disc degeneration and annular bulging at L2-

3 and L3-4. *Id.* From June 3, 2013, to October 8, 2015, Dr. Sandoz examined Plaintiff and noted she had normal and unremarkable physical examinations, including normal lumbar spine findings, but noted cervical and lumber muscle spasms, decreased deep tendon reflexes, displacement of cervical intervertebral disc without myelopathy, cervical spine tenderness, decreased range of motion, and lurching gait. Tr. at 22–23. On July 1, 2013, Dr. Gordin reviewed Plaintiff's MRI scans of her spine and assessed her with multilevel spondylotic changes, but without focal disc herniation or severe central stenosis noted. Tr. at 21. On October 29, 2013, Dr. Sandoz opined Plaintiff could return to work performing light work with no repetitive bending of the neck and no lifting more than 10 pounds. Tr. at 22. On November 25, 2013, Dr. Hoopla reviewed MRI scans of Plaintiff's brain and assessed Plaintiff's diagnostic findings as unremarkable. Tr. at 21. On January 24, 2014, Dr. Scott found Plaintiff's examination was unremarkable except for hip findings and noted she had improvement with physical therapy and other treatment. Tr. at 21–22. Dr. Scott opined Plaintiff should be able to work without restrictions. Tr. at 22. On May 9, 2014, Dr. Lind examined Plaintiff, noting she had no obvious mental impairments, she was fully oriented, and her affect was appropriate. Tr. at 15. He diagnosed Plaintiff with adjustment disorder with mixed anxiety, depressed mood, and a Global Assessment of

Functioning ("GAF") score of 60. *Id.* Dr. Lind noted Plaintiff's testing only indicated mild depression and moderate anxiety. *Id.* On September 2, 2014, Ms. Townsend completed an employability analysis that noted Plaintiff was independent in her self-care, able to drive, and performed light household chores, despite some difficulty in concentrating. Tr. at 25–26. HopeHealth records from November 17, 2014, to August 25, 2016, revealed normal examinations, but noted bursitis, bilateral knee weakness with mildly reduced ROM and limping gait. Tr. at 23. On December 17, 2015, Mr. Brown opined Plaintiff would not be able "to perform any type of work on a sustained basis, eight hours a day, five days a week, as is required in work employment." Tr. at 25. In 2016, Dr. Federer performed a neuropsychological examination and he assessed Plaintiff with a composite FSIQ of 89, but explained that Plaintiff's IQ appeared to be lower "than one would expect" given her accomplishments. Tr. at 16. Dr. Federer opined Plaintiff would recover from her head injury without persistent cognitive deficits. *Id.* Dr. Federer diagnosed Plaintiff with depression and recommended Plaintiff manage her depression with pain management and individual psychotherapy. *Id.*

The ALJ stated he assessed Plaintiff's RFC based on her medical records, the other evidence of record, her testimony, and the limitations

imposed by her impairments individually and in combination, the medical opinions on file, the medical consultant opinion evidence and vocational evidence. Tr. at 18–26. He found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. at 23. He explained he found Plaintiff's symptoms affect her ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence. *Id.*

The ALJ gave great weight to medical consultants Drs. Boland and Slooten's opinions that Plaintiff did not have severe impairments and Dr. Walker's opinion that Plaintiff's impairments limited her to the medium exertional range of work. Tr. at 25. He found Drs. Boland and Wooten's opinions were based on specialized program knowledge, were supported by Plaintiff's treatment history, and consistent with the evidence as a whole. *Id.* He gave partial weight to Dr. Scott's opinion that Plaintiff could work without restrictions, little weight to Dr. Sandoz's opinion that Plaintiff could perform light duty with some limitations, and no weight to Mr. Brown's opinion that Plaintiff could not perform any work, explaining Mr. Brown's opinion was on an issue reserved to the Commissioner. Tr. at 22, 25. The ALJ found Plaintiff had an unremarkable treatment history and indicated

Plaintiff's symptoms were improved when she was complaint with her treatment regime. Tr. at 26. He stated he considered all the available evidence and adopted several accommodations and found Plaintiff had the RFC to perform light work, with no climbing ladders, ropes, or scaffolds, no working at unprotected heights, and no concentrated exposure to smoke, fumes, odors, dust, gases, and poor ventilation. Tr. at 18, 26.

The undersigned finds the ALJ provided an extensive narrative discussion, citing specific medical facts and opinions and non-medical evidence, to support his RFC. Tr. at 18–26. The ALJ considered Plaintiff's allegations regarding her physical and mental limitations, but rejected them as inconsistent with the objective evidence and medical opinions of record. Therefore, he satisfied his burden under SSR 96-8p to explain how any material inconsistencies or ambiguities in the record were resolved. Based on the ALJ's thorough explanation and the absence of any unresolved inconsistencies in the record, the undersigned finds that substantial evidence supports his finding that Plaintiff had the RFC to perform light work, with no climbing ladders, ropes, or scaffolds, working at unprotected heights, and no concentrated exposure to smoke, fumes, odors, dust, gases, and poor ventilation.

b)      Ability to perform sustained work activities

Plaintiff argues her pain, medication side effects, inability to concentrate, and her need for unscheduled breaks during the day limit her ability to persist in the work setting and to have regular attendance. [ECF No. 15 at 25].

The Commissioner argues the ALJ implicitly found Plaintiff had the ability to work an eight hour day when he found Plaintiff could perform a limited range of light work. [ECF No. 16 at 28–29].

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945."[4] SSR 96-8p, 1996 WL 374184 at *7 (1996). "Only after that may RFC be expressed in terms of the exertional levels of  work, sedentary, light, medium, heavy, and very heavy." *Id.* at *1.

---

[4] Paragraph (b) addresses physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching. 20 C.F.R. § 404.1545(b) and § 416.945(b). Paragraph (c) addresses mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting. *Id.* Paragraph (d) addresses other abilities affected by impairments, such as skin impairments; epilepsy; impairments to vision, hearing, or other senses; and impairments that impose environmental restrictions. *Id.*

Despite this language in SSR 96-8p, the Fourth Circuit has declined to adopt "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." *See Mascio*, 780 F.3d at 636.

Addressing Plaintiff's testimony, the ALJ noted Plaintiff stated she had difficulty concentrating, was able to sit for 15–20 minutes before becoming uncomfortable, could walk for 20 minutes with an unsteady gait, and stand for 10 to 15 minutes due to pain in her back. Tr. at 15, 19. Plaintiff also testified she lays down three times a day, for 20 minutes to one hour a day, for pain relief, and stated her medication makes her groggy. Tr. at 19. In rejecting Plaintiff's allegations about how her pain symptoms, medication side effects, and inability to concentrate affected her abilities to persist during her ADLs, the ALJ determined the totality of the evidence suggested her impairments limited her to light work. Tr. at 23, 26. However, he did not individually address her ability to sustain work on a regular and continuing basis.

This court has found that that a RFC determination may properly contain implicit findings that Plaintiff was physically able to work an eight-hour day. *Holbrooks v. Colvin*, No. 8:13-2220-RMG, 2015 WL 760021, at *19 (D.S.C. Feb. 20, 2015), citing *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006) ("In light of SSR 96-8p, [the ALJ's] conclusion [that Plaintiff could

perform a range of sedentary work] implicitly contained a finding that [Plaintiff] physically is able to work an eight hour day."); *Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (holding that the ALJ implicitly found claimant was not limited in the areas of sitting, standing, and walking when he specifically addressed in the RFC the functions in which he found a limitation); *see also Robinson v. Astrue*, No. 10-185-DCN-BHH, 2011 WL 4368416, at *8 (D.S.C. Feb. 18, 2011) ("To the extent the function-by-function quality of the analysis leaves something to be desired in terms of thoroughness, the Court would agree with the defendant that the limitation to light work implicitly includes a finding that the plaintiff could stand or walk off and on for a total of approximately six hours of an eight-hour workday and a finding that the plaintiff could occasionally perform the postural activities of climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling), adopted by 2011 WL 4368396 (D.S.C. Sept. 19, 2011).

A job falls in the "[l]ight work" category when it "involves lifting no more than 20 pounds at a time with frequently lifting or carrying of objects weighing up to 10 pounds" and "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) and § 416.967(b). "Since frequent lifting or

carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. Thus, in limiting Plaintiff to light work, the ALJ implicitly found that she was capable of lifting and carrying up to 10 pounds frequently and up to 20 pounds occasionally and standing and walking for up to six hours in an eight-hour workday. *See* 20 C.F.R. § 404.1567(b) and § 416.967(b); SSR 83-10.

In rejecting Plaintiff's specific allegations, the ALJ cited examination findings, objective test results, medical opinions, Plaintiff's ADLs and included a narrative discussion describing how all the relevant evidence supported his conclusions. *See* SSR 96-8p; *See Supra*. The undersigned finds the ALJ cited substantial evidence to support his conclusion that Plaintiff's pain symptoms, medication side effects, and inability to concentrate would not result in frequent unscheduled breaks and absenteeism as she alleged, but would instead allow her to perform light work, with no climbing ladders, ropes, or scaffolds, working at unprotected heights, and no concentrated exposure to smoke, fumes, odors, dust, gases, and poor ventilation. In light of the foregoing, the undersigned finds the ALJ adequately accounted for Plaintiff's pain symptoms and inability to concentrate in assessing her abilities to perform sustained work activity.

3.    Medical Opinions and Findings

In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

a)    Dr. Sandoz

Plaintiff argues the ALJ erred in giving little weight to the medical opinions of her treating orthopedist Dr. Sandoz. [ECF No. 15 at 25]. Plaintiff contends Dr. Sandoz indicated repeatedly in his notes that she had severe neck, low back, and upper and lower extremity pain that was exacerbated by prolonged standing, walking, and exertion. *Id.* at 26. Plaintiff argues the ALJ dismissed Dr. Sandoz's opinion "with the thin excuse that the opinions were part of a worker's compensation case that was several years old at the time of the hearing." *Id.*

ALJs must consider all medical opinions of record. 20 C.F.R. § 404.1527(b) and § 416.927(b). The regulations direct ALJs to accord controlling weight to treating physicians' medical opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic

techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2).

However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). Furthermore, "Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d). "Opinions that you are disabled" are among those reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3). "[A] treating physician's opinion is only entitled to such . . . deference when it is a medical opinion." *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014) *citing Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492–93. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors—his decision need

only 'explain the consideration given to the treating source's opinion.'" *Id.*

*citing Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013)

(quoting SSR 96-5p).

If the treating physician's opinion is not entitled to controlling weight, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; *see* 20 C.F.R. § 404.1527(c).

In assigning little weight to Dr. Sandoz's opinion, the ALJ discussed the objective findings and medical opinions of Dr. Sandoz. *See* Tr. at 22–23. On June 3, 2013, Dr. Sandoz examined Plaintiff with cervical and muscle spasms, but also noted mostly normal findings including no motor weakness, intact balance and gait, intact coordination, normal fine motor skills, and preserved deep tendon reflexes. Tr. at 22. The ALJ noted that during her follow up appointment, Plaintiff complained of difficulty ambulating and requiring assistance with ADLs, however the ALJ found her examinations remained normal except for decreased deep tendon reflexes. *Id.* The ALJ explained that in subsequent examinations, Plaintiff's deep tendon reflexes

were once again examined normally despite Plaintiff's continued complaints of problems. *Id.* The ALJ noted Dr. Sandoz's October 29, 2013, opinion that Plaintiff "could return to work performing light duty with no repetitive bending of the neck and no lifting more than 10 pounds." *Id.* The ALJ explained he gave this opinion little weight because the opinion was over three years old and was made in relation to Plaintiff's worker's compensation claim and went to an issue reserved to the Commissioner. *Id.* The ALJ further explained he considered Dr. Sandoz's examination findings in making his RFC determination. *Id.* In 2014, Dr. Sandoz referred Plaintiff to physical therapy and in a letter dated February 17, 2014, the physical therapist opined Plaintiff could perform light to sedentary work with additional postural limitations. Tr. at 23. The ALJ noted he gave this February 17, 2014 opinion no weight, as it was not from an approved medical source and was tied to Plaintiff's workers compensation claim, but he noted the opinion was not entirely inconsistent with the accommodations defined at finding five within his decision. *Id.* On June 24, 2014, Dr. Sandoz noted Plaintiff had no surgical pathology. Tr. at 22. The ALJ observed Dr. Sandoz continued to treat Plaintiff conservatively with medications after she continued to complain of symptoms, including cervical and lumbar spine spasms. *Id.* On November 18, 2014, the ALJ noted Plaintiff was assessed with displacement of cervical

intervertebral disc without myelopathy, however, Plaintiff's physical examinations remained normal. *Id.* The ALJ noted Plaintiff's examinations by Dr. Sandoz continued to be unremarkable including normal lumbar spine findings. *Id.* On May 29, 2015, Dr. Sandoz referred Plaintiff for an updated MRI scan, and Plaintiff was assessed with mild central canal and severe left neural foraminal stenosis at C4-5, severe DDD at C5-6 mild stenosis bilaterally, and with a small central disc protrusion C6-7 without central canal stenosis with mild left C7 foraminal stenosis. *Id.* The ALJ observed Dr. Sandoz continued to treat Plaintiff in 2016, and his treatment notes indicate he treated Plaintiff primarily with medication, including Lioderm patches. Tr. at 23. The ALJ noted that although Plaintiff continued to complain of severe pain symptoms, Dr. Sandoz's physical examinations of Plaintiff remained unremarkable, only indicating cervical spine tenderness, decreased ROM, and lurching gait. *Id.* The ALJ explained he relied on the evidence in the record, including treatment notes from Drs. Sandoz and Scott, in determining Plaintiff's severe impairments resulted in some limitations, but the limitations were not as significant as Plaintiff alleged and would not preclude all work. *See generally* Tr. at 18–26.

The undersigned finds that to the extent Plaintiff argues the ALJ should have given controlling weight to Dr. Sandoz's opinion concerning her

ability to work, Plaintiff is incorrect, as this opinion is on a matter that is reserved to the Commissioner and is therefore not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(3) and § 416.927(d)(3).

In light of evidence the ALJ considered Dr. Sandoz's impressions at multiple stages of the adjudicative process and credited them, in part, in assessing Plaintiff's severe impairments and RFC, the undersigned finds the ALJ properly evaluated Dr. Sandoz's medical opinion. The undersigned finds the restrictions included in the RFC assessment and the ALJ's finding that Plaintiff was not disabled was not contrary to the medical opinions in the record.

b)    Drs. Lind and Federer

Plaintiff also contends the ALJ sought to ignore the treating specialist opinions of Drs. Lind and Federer because they were given many years before her hearing. [ECF No. 15 at 27]. Plaintiff argues diagnostic findings and neuropsychological testing support these doctors' opinions and therefore their opinions should have been given controlling weight. *Id.* at 28.

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p. However, "[a] non-treating source is 'a physician, psychologist, or other acceptable medical source who has

examined you but does not have, or did not have, an ongoing treatment relationship with you.'" *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (citing 20 C.F.R. § 404.1502, finding that the ALJ properly determined that a physician who examined claimant once at the behest of claimant's attorney was a non-treating source). Non-treating source opinions are not entitled to controlling weight, but "the ALJ must follow SSA rules requiring consideration of the background and expertise of the experts, the supporting evidence in the record for the opinions and consistency of the opinions." *Bryant ex rel. Bryant v. Barnhart*, 63 F. App'x 90, 95 (4th Cir. 2003) (citing SSR 96-6p).

The ALJ discussed Dr. Lind's May 9, 2014 psychological evaluation of Plaintiff, noting Dr. Lind found she had no obvious mental impairments. Tr. at 15. The ALJ observed Dr. Lind assessed Plaintiff with a FSIQ of 77, but noted Plaintiff did not have "evidence of dysfunction with the higher-level skills." *Id.* The ALJ explained he considered Plaintiff's GAF score of 60 and all of the relevant evidence and weighed them as required by §§ 20 CFR 404.1527(c), 416.927(c), and SSR 06-03p. *Id.* The ALJ also noted Dr. Lind provided a deposition to the South Carolina Workers' Compensation Commission regarding Plaintiff's worker's compensation case in which he opined Plaintiff had reached maximum medical improvement for her work

related injury and found she possessed at least "an average level of intelligence." *Id.*

The ALJ noted Dr. Federer's neuropsychological evaluation of Plaintiff in which he assessed Plaintiff with a FSIQ of 89, which was in the low-average range, opining her IQ appeared to be lower "than one would expect" given her accomplishments. Tr. at 16. The ALJ also noted Dr. Federer's opinion that Plaintiff would recover from her mild head injury without persistent cognitive deficits. *Id.* The ALJ found Dr. Federer's opinions were not entirely inconsistent with his conclusion that Plaintiff's mental impairments were nonsevere. *Id.*

The ALJ noted Dr. Lind diagnosed Plaintiff with mild depression and moderate anxiety, and Dr. Federer diagnosed Plaintiff with depression and recommended she manage her depression with pain management and individual psychotherapy. Tr. at 15–16. The ALJ observed there was no evidence in the record Plaintiff attended recurring psychotherapy or counseling with a mental health professional. *Id.*

As an initial matter, the undersigned notes Drs. Lind and Federer performed psychological evaluations of Plaintiff but did not have an ongoing treatment relationship with her. Accordingly, their opinions were not entitled to controlling weight. *See Bryant ex rel. Bryant*, 63 F. App'x at 95. A review

of the ALJ's decision demonstrates he adequately considered Dr. Lind's and Federer's opinions and explained his reasons for giving their opinions little weight. *See* Tr. at 16–17 (discussing evidence that supported a finding that Plaintiff had no restrictions in understanding, remembering or applying information; no restrictions in social functioning; no restrictions in concentrating, persisting, or maintaining pace; and no restrictions in ADLs); Tr. at 15 (summarizing Plaintiff's testimony); Tr. at 16 (discussing Plaintiff's lack of treatment history with a mental health professional); Tr. at 15–16 (noting Drs. Lind and Federer offered their opinions several years prior in Plaintiff's worker compensation claim where the issue was whether Plaintiff could return to her work as a nurse). The undersigned finds Plaintiff's argument concerning deficiencies in the ALJ's evaluation of Drs. Lind and Federer's opinions to be without merit.

4.      Improper Hypothetical

Plaintiff argues the ALJ asked the VE a legally insufficient hypothetical because it did not accurately reflect all of her physical and mental limitations. [ECF No. 15 at 29]. The Commissioner contends the hypothetical question to the VE was sufficient. [ECF No. 16 at 29].

At step five of the sequential evaluation, the Commissioner bears the burden to provide proof of a significant number of jobs in the national

economy that a claimant could perform. *Walls*, 296 F.3d at 290. The VE's testimony is offered to assist the ALJ in meeting this requirement. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). For a VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979).

Although Plaintiff argues she had well-established limitations in concentration, persistence and pace, the ALJ found Plaintiff did not have any limitations in this area after evaluating the reports and opinions of Plaintiff's medical providers, *see* Tr. at 15–16, Plaintiff's function report, in which she indicated she is able to get along with authority figures, is "good" at handling stress, and "good" at handling changes in her routine, *see* Tr. at 17, and Plaintiff's testimony that she is able to drive, do light household chores, visit with family, watch television, and water her plants, *see* Tr. at 19. The

undersigned finds the ALJ considered the evidence in the record, including Plaintiff's testimony and the opinions of her treating, examining, and reviewing medical providers, and concluded Plaintiff could perform light work, with no climbing ladders, ropes, or scaffolds, working at unprotected heights, and no concentrated exposure to smoke, fumes, odors, dust, gases, and poor ventilation. In light of the foregoing evidence, the undersigned finds the record did not requirethe ALJ to include additional limitations in his hypothetical questions to the VE.

Plaintiff also argues the ALJ's step four finding was ambiguous because the ALJ indicated in one of his findings of fact that Plaintiff could return to her PRW as a practical nurse and insurance clerk, but in his decision he indicated Plaintiff could only perform her PRW as an insurance clerk. [ECF No. 15 at 29]. The undersigned finds that any ambiguity is harmless because the ALJ discussed in his narrative the hypothetical given to the VE and concluded Plaintiff was capable of performing her PRW as an insurance clerk, but not as a practical nurse. Tr. at 26–27.[5]

---

[5] *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (applying harmless error analysis in Social Security case); *see also Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000) (holding that remand is not necessary if it would "amount to no more than an empty exercise"); *Austin v. Astrue*, 2007 WL 3070601, *6 (W.D. Va. Oct. 18, 2007) ("Errors are harmless in Social

5.     Error in not proceeding to Step 5

The undersigned finds the ALJ's finding that Plaintiff can perform her PRW as an insurance clerk is supported by substantial evidence. Accordingly, the undersigned declines to find the ALJ erred in not proceeding to step 5.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

*Shiva V. Hodges*

January 4, 2019                              Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

---

Security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").